WILLIAM CANTRELL, ROBERT J. DONLIN, ROBERT L. DANIEL, FREEMAN HANSEN, LESTER J. GILFILLAN, ROBERT J. GOW, LEO G. HARRIS, ROLLIE F. HENDERSON, CARL HOLSON, ANTONE L. IVERSON, FRED C. JOSUCKS, WILLIAM JAMES, GLENN JAMES, FRANK KURTH, WALTER R. KIDDER, JOHN LEBERT, ALBERT J. McDANIELS, WILLIAM H. MANLEY, ROBERT J. MORRIS, WILLIAM F. MORRIS, LEONARD OLSON, J. A. POIRIER, CLIFFORD L. RATHBURN, JACK ROOT, JOHN RUCKS, ARNE RANTA, ALBERT THIBODEAU, ALF THORSHEIM, W. D. WAUGH, Certain Employees of Anaconda Copper Mining Company, Who Are

Members of AFL Local 3038 Lumber & Sawmill Workers of Bonner, Montana, Plaintiffs and Respondents, *v.* BENEFIT ASSOCIATION OF RAILWAY EMPLOYEES, a Corporation, Defendant and Appellant.

No. 9839.

Submitted October 13, 1959. Decided December 3, 1959.

As amended on denial of rehearing January 28. 1960.

348 Pac. (2d) 345.

428

See **C. J. S.** Insurance, § 1433.

Edmond G. Toomey and Michael J. Hughes, Helena, for appellant. Michael J. Hughes argued orally.

John W. Bonner, Helena, and Wesley W. Wertz, Helena, for respondents. John W. Bonner argued orally.

MR. JUSTICE ANGSTMAN delivered the Opinion of the Court.

This is an appeal by defendant from a judgment in favor of each plaintiff for individual claims alleged to be due each of them under a contract of group insurance. The contract covered hospital and medical expense incurred by those insured.

The contract was originally drafted on May 12, 1952, and was made effective from May 1, 1952, until May 1, 1953.

It contained this clause: "In event the number of insureds hereunder becomes less than twenty-five, the Association shall decline to renew this policy at the expiration of the current insurance year. If the number of Insureds hereunder becomes less than 75% of the eligible employees, the Association reserves the right to cancel this policy on any premium due date by giving thirty days' notice of intent to cancel."

Obviously, under this clause the notice of intent to cancel had to be given thirty days before the time fixed for the cancellation date.

On April 9, 1953, a rider was attached to the policy to be effective as of May 1, 1953, which increased the premium rates and contained a clause to the effect that the first $50 of expenses incurred by each insured was not covered by the policy of insurance.

Likewise the rider contained this clause:

"1. Said contract is renewed for a period of one month from May 1, 1953, and thereafter for periods of one month each by the payment of the required premiums in advance until terminated by the Association by giving notice in writing of the de-

sire for such termination at least thirty days prior to the date such termination is to become effective."

It also contained the following clause:

"3. If the number of Insureds under said contract on May 1, 1953, is less than 75% of the eligible employees, said contract shall be cancelled as of May 1, 1953. If the number of Insureds under said contract becomes less than 75% of the eligible employees on or after June 1, 1953, the Association reserves the right to cancel said contract on any premium due date by giving thirty days' notice of intent to cancel."

It was the practice for the employer, the Anaconda Company, to deduct premiums for the insurance from the pay checks of its employees and remit them to the insurer. In May of 1953, when most of the claims in controversy here arose, the union had a membership of 432. The number of employees eligible to participate in the group insurance fluctuated since, under the contract, an employee was not eligible until he had been employed for at least 90 days.

Premiums had been deducted from pay checks of 239 employees for the May premium and these had been transmitted to the insurer.

On May 29, 1953, defendant wrote a letter to the recording secretary of the union stating that the premiums for the month of May had been received but that they would be held in abeyance until "satisfactory arrangements for the continuation of the group insurance contract covering the members of your union are completed." Evidently defendant did not consider the contract of insurance as having been cancelled. It held the May premiums and the June premiums until June 18, 1953, when they were returned to the employer.

The evidence is not clear as to the exact number of employees eligible for coverage as of May 1, 1953. There is some evidence that that number was 325; 75% of that number would have called for a coverage of 243 whereas there were only 239 who

paid premiums for May 1953. Hence, it is a fair conclusion that there was not a 75% coverage on May 1, 1953.

But it does not follow that the contract was at an end as contended by defendant. Much of the time during the life of the original contract, there was less than 75% coverage and yet the defendant took no steps to cancel the policy. The conduct of the insurance company indicated that it was concerned more with an increase in the premium rate, which became effective May 1, 1953, than with the number of insured, since that number was at all times well in excess of the minimum of 25 specified in the original contract. It did not stand on the rider and declare the policy cancelled on May 1st as it might have done, but on the contrary it held the premium and in effect led the insured employees to believe that the contract was still effective.

The provisions in the rider, with respect to notice of cancellation, are ambiguous and hence must be construed most strongly against the party responsible for the ambiguity which in this case is the defendant since it drafted the rider. One thing is certain and that is that if the average fell below 75% on or after June 1, 1953, the defendant had the right to cancel the policy on any premium due date by giving 30 days' notice of intent to cancel. Likewise it is plain that the contract of insurance, as well as the rider, recognized the need to give notice of cancellation in order to terminate the contract.

The only effect of the clause providing for cancellation of the contract, if the coverage was less than 75% as of May 1, 1953, was to obviate the necessity for thirty days' notice. It did not obviate the necessity of notifying the insured that they were no longer insured and that the contract was cancelled. The insured were entitled to be notified that the contract was cancelled in order to be enabled to obtain other insurance if they so desired.

Here, instead of notifying the insured that the policy was cancelled, defendant retained the premiums and led the insured to believe that they were covered by the contract as

theretofore. The purpose of the notice of cancellation is to enable the insured to obtain insurance elsewhere. 29 Am. Jur., Insurance, section 284; Poch v. Equitable Life Assur. Soc., 343 Pa. 119, 22 A. (2d) 590, 142 A.L.R. 1279; Shears v. All States Life Ins. Co., 242 Ala. 249, 5 So. (2d) 808.

We do not regard the cases of Wilson v. Royal Union Mutual Life Ins. Co., 137 Iowa 184, 114 N.W. 1051; Zaunczkowski v. Travelers Ins. Co., 3 N. J. Super. 442, 66 A. (2d) 463; Keane v. Aetna Life Ins. Co., 22 N.J. Super. 296, 91 A. (2d) 875, and others relied on by defendant as applicable to a situation such as we have here. In those cases the contract provided that an event known to the insured or brought about by his action would cancel the policy without any notice.

Here the insured individuals did not know whether or not there was 75 percent coverage, but had the right to assume that there was since defendant withheld the premium and treated the contract as fully effective so far as each individual insured was concerned until it finally returned the premiums in June 1953.

There is no merit in defendant's contention that the contract, under the facts here shown, was terminated on May 1, 1953.

Defendant contends that the court erred in overruling its ██ demurrer to the amended complaint on the ground of misjoinder of parties plaintiff.

All the plaintiffs are employees of the Anaconda Company at its lumberyard at Bonner, Montana. The policy of insurance was made directly with such employees who paid the required premium. There was only one contract. The principal issue in the case is whether that contract was in effect in May 1953 or whether it had been cancelled. All plaintiffs were interested in that question.

R.C.M. 1947, section 93-2811, provides: ''All persons having an interest in the subject of the action, and in obtaining

the relief demanded, may be joined as plaintiffs, except when otherwise provided in this chapter.''

And under section 93-2821, it is provided that: ''Of the parties to the action, those who are united in interest must be joined as plaintiffs or defendants.''

An exception is there made in a case where the parties are so numerous that it is impracticable to bring them all before the court in which case one or more may sue or defend for the benefit of all. Here all plaintiffs are united in interest in that they are interested in a finding that the contract was in effect in May 1953.

''* * * where there is but one cause of action, persons who have an interest therein may join as plaintiffs notwithstanding their interests are distinct and severable.'' 67 C.J.S. Parties section 19, page 933, note 28; Johnson v. Wright, 175 Minn. 236, 220 N.W. 946, and ''their interests need not necessarily be equal.'' 67 C.J.S., Parties, section 19, page 933, note 19; and section 21, page 937, notes 88 and 89.

Statutes such as section 93-2811 must be liberally construed. 67 C.J.S., Parties, section 21, page 935, note 61.

Ohio has a statute practically identical with our section 93-2821, and the Supreme Court of Ohio in Smith v. Kroeger, 138 Ohio St. 508, 37 N.E. (2d) 45, quoted with approval from the earlier case of Haggerty v. Squire, 137 Ohio St. 207, 28 N.E. (2d) 554, as follows:

''Where a number of persons have separate and individual claims and rights of action against the same party, but all such claims arise from a common source and represent a like interest, the whole matter may be litigated in a single action brought by all of the claimants as co-plaintiffs, or, in case the parties are numerous making it impracticable to bring them all before the court, by one or more of them suing for himself or themselves and on behalf of the other claimants.'' [37 N.E. (2d) 47.]

Statutes on joinder of parties plaintiff similar to our sec-

■ tions 93-2811 and 93-2821, have in effect, adopted the equity rules governing joinder of parties. 39 Am. Jur., Parties, section 26, page 885. See also National Surety Co. v. City of Louisville, 165 Ky. 38, 176 S.W. 364; Dixie Fire Ins. Co. v. American Confectionery Co., 124 Tenn. 247, 136 S.W. 915, 34 L.R.A., N.S., 897, and cases therein cited; Pomeroy's Equity Jurisprudence, Vol. 1 (5th ed.) sections 257, 261(a).

Here all persons having claims against defendant, arising after May 1, 1953, and before the contract was terminated on June 18, are interested in the question as to whether the contract was cancelled on May 1. One determination of that question should settle it for all interested parties and thus prevent a multiplicity of actions.

As is stated in 39 Am. Jur., Parties, section 27, page 887,

"The principle which underlies this doctrine of equity is that every judicial controversy should, if possible, be ended in one litigation, and that the decree pronounced in a single suit should determine all rights, interests, and claims, should ascertain and define all conflicting relations, and should forever settle all questions pertaining to the subject matter."

And in 39 Am. Jur., Parties, section 26, page 886, it is said:

"Statutory provisions on the subject of joinder of parties must be allowed considerable flexibility to meet the requirements of justice and convenience in the cases as they arise. In many instances it may be said that the question who shall be made parties in a given cause is one of convenience and discretion rather than of absolute right, to be determined according to the exigency of the particular case."

Here the court did not abuse its discretion in overruling de ■ fendant's demurrer on the ground of misjoinder of parties plaintiff.

Defendant also contends that the court erred in overruling ■ its motion to require plaintiffs to separately state and number their causes of action and its motion to make the complaint more definite and certain.

Here there is but one cause of action, viz., the existence or nonexistence of the group insurance contract in May 1953. That affected all the parties plaintiff and the defendant. The fact that the contract gave rise to different claims to each plaintiff did not make of it several causes of action, but if so, they were properly joined under section 93-3203 since they affected all the parties.

The next point raised by defendant is that even if the contract was in force during May and June 1953, the plaintiffs did not show that they are entitled to any sum whatsoever, and hence that its motion for nonsuit should have been sustained.

Plaintiff, by its Exhibit 4, submitted the written claims of all the plaintiffs but offered no evidence to substantiate the claims. No witness was examined as to the correctness of the claims and defendant was not afforded the right of cross-examination of any of the claimants or any other witness touching upon the question of the merits of the several claims.

Under the circumstances the motion for nonsuit should have been sustained. Also defendant pleaded in its answer that 14 of the 29 claimants failed to furnish to defendant affirmative proof of loss within ninety days after the date of such loss. Since the cause must be remanded for a new trial this issue must also be determined upon evidence bearing upon the point.

We call attention also to two of the claims which cannot be sustained under any theory. One claim was by Carl Holson which appears on its face to be a claim for $250 for entering the hospital on June 26, 1953, which was after the policy was cancelled by the giving of notice on June 18 and return of the premiums. Another is by Robert J. Gow for surgery on June 29, and this too was after the policy had been cancelled.

The cause is remanded and a new trial ordered.

MR. JUSTICE BOTTOMLY and MR. JUSTICE ADAIR concur.

436

MR. CHIEF JUSTICE HARRISON dissenting:

I am unable to concur in the foregoing opinion, insofar as it holds that the group insurance contract was in force and effect on and after May 1, 1953. The majority of this court concede that there was not a 75% coverage on May 1, 1953, but hold that in their opinion the provisions of the rider are ambiguous and must be construed most strongly against the party responsible for the ambiguity, in this case the defendant. I find no fault with this rule if I could convince myself that the rider is ambiguous but I am unable to do so. The majority also hold that it is plain that the group insurance contract and the rider recognize the need for notice of cancellation in order to terminate the contract on May 1, 1953.

In order to make my position clear I should like to discuss the evidence pertaining to the execution of the rider. The record discloses that under the group insurance contract the amount paid for claims was entirely disproportionate to the amount of premiums received, in fact during the year commencing May 1, 1952, to May 1, 1953, $16,875.30 was paid in premiums, and benefits in the sum of $22,069.80 were paid out. The insurer being aware of this situation as it progressed during the year, on March 6, 1953, addressed a letter to Mr. J. E. Johnson, recording secretary of the union at Bonner, Montana, and advised him that an examination into the experience under the group insurance contract here in question indicated that the sum paid in claims was no longer in proper proportion to the premium. The letter then stated:

"The large amount paid in claims has proven the need of coverage and the valuable protection provided by your contract. You understand, we are sure, that it would not be proper for us to continue your contract on its present basis at a loss. Therefore, it will be necessary, in the event mutually agreeable arrangements for continuing protection after May 1, 1953, are not reached, to terminate the above-numbered con-

tract as of that date. We sincerely hope that agreement will be reached so that we may continue to insure your members since otherwise this letter will constitute the 30 days notice of termination required by the contract. Of course, any payment which has been or may be made, which would apply as premium for any period beyond May 1, 1953, will be applied in accordance with the new arrangement or, if agreement is not reached, will be returned."

Thus, it will be seen that the union was advised nearly two months before the date of termination of the insurance contract that it would be necessary to make other arrangements if the insurance was to be continued, and that any payment of premiums for any period beyond May 1, 1953, would be applied in accordance with the new arrangement or, if an agreement was not reached, would be returned.

On March 16, 1953, the union, through Mr. Johnson, its recording secretary, wrote to the insurer advising that the writer had contacted the insurer's representative and arranged a meeting with the union members for March 19, 1953. The letter also informed the insurer that the insurer's representative had attended the union meeting on March 8, 1953, and "explained the status of our plan to the membership." The letter further stated that "some sort of revision of our present contract with you is essential to prevent lapse of coverage on our membership."

Mr. Johnson testified that the insurer's representative met and discussed this matter with him, also with the insurance committee of the union, and as a result of such meetings a letter was prepared, printed and distributed to all the members of the union covered by the group insurance policy. This letter was dated March 21, 1953, and explained the changes to be made in the premium rates and other provisions of the group insurance contract, and concluded:

"If you want to discontinue coverage as of May 1, 1953, please hand resignation to your Secretary James Johnson. Other-

wise deduction will be made, if your local decides to continue program.''

Thereafter the execution of the rider was discussed with the members of the union and the same was executed by it. It is therefore apparent that the insureds well knew all the provisions contained in the rider by which the policy could be extended if they were met. The record further discloses that the premiums were payable in advance, so the premiums for the month of May 1953, were deducted by the employer from its April payrolls and at some time, not disclosed by the record, were remitted to the insurer. Since the rider provided that 75 % of the total number of eligible employees had to be insured on May 1, 1953, the insurer requested its representative to secure this information and furnish it to the insurer. On May 21, 1953, the representative advised the insurer that he could not secure the exact number, as neither the general manager nor the cashier were able to give him such information.

On May 29, 1953, the insurer wrote to Mr. Johnson, as recording secretary for the union, as follows:

''We have received a check in the amount of $1,419.90 representing payment of premium under the group insurance contract numbered above for the insurance month beginning May 1, 1953. We will hold this payment in abeyance until such time as satisfactory arrangements for the continuation of the group insurance contract covering the members of your union are completed.

''We would appreciate your sending us the total number of employees eligible for coverage under this insurance contract. If it is at all possible, an itemized listing would be desirable.

''Our representative Mr. R. K. Gossard will be in contact with you very shortly, if he has not already done so, to inform you of the conditions necessary for the continuance of the Hospitalization protection.''

The evidence discloses that no reply was made to such letter nor was any information furnished the insurer by the union

or the employer as to the total number of employees eligible for coverage under the insurance contract.

On June 18, 1953, the insurer returned the premiums paid and advised that they were not acceptable due to the cancellation of the group hospital contract on May 1, 1953.

I cannot see any ambiguity in the first sentence of the third paragraph of the rider, which I feel is determinative here. It provides: "If the number of insureds under said contract on May 1, 1953, is less than 75% of the eligible employees, said contract shall be cancelled as of May 1, 1953." It appears to me to be extremely clear in its wording, but I will admit that it does require some information to be furnished the insurer as to the number of eligible employees. I have heretofore outlined the steps taken by the insurer to ascertain this information and its lack of success. The situation confronting the insurance company is well illustrated in the testimony of John W. Crews, vice president of the group department of the insurance company, when he was asked:

"Q. Now, Mr. Crews, how could you ascertain how many were eligible for insurance or seeking insurance in the new Rider in 1953? A. We had no way ourselves of verifying the information other than to accept the information given us by either the union or the employer, or might be told to our agents and then given to us. We had no access, of course, to the records of the employer nor the records of the union; all we had to go by is what they would tell us.

"Q. How could you tell how many of those seeking insurance under the May 1 Rider, how many members comprised that number? Well, the only way we could tell for sure would be when the premium for May 1 was actually received when we could see how many people payments were being made for."

The majority hold that it was the duty of the insurance company to notify the union that the contract had been cancelled in order to enable the union to obtain other insurance

if they desired. I believe the evidence outlined shows conclusively that the union was aware of the provisions of the rider and in my opinion it had some obligation to the insurer to furnish information when requested, as it was in the letter of May 29, 1953. It is apparent to me that the insurer endeavored to the best of its ability to ascertain the facts as to the number of eligible employees without any assistance from the insured.

Another factor present in this case is that the trial was commenced on April 3, 1956, and recessed until such time as the plaintiffs could produce information with regard to membership in the union from their books, and thereafter and on December 19, 1956, the trial was resumed. At that time the union produced in evidence a certificate showing that the membership of the union in May of 1953 was 432, and in June it was 436. The certificate further shows that this information was taken from the monthly union per capita reports. To me it is thus clear that the union was in possession of the information requested by the insurer at all times but failed to co-operate with insurer and give it the information requested because the union was well aware of the terms of the rider and the fact that its books would disclose that on May 1, 1953, there did not exist a 75% coverage. I agree with the majority opinion that there was some evidence that the number of eligible employees was 325 and that 75% of that number would be 243 and only 239 had paid premiums for May 1953. However such evidence was the best guess that insurer's representative could make from the information he received. Turning to the union's per capita reports we find there was a membership of 432 in May 1953, and the certificate states that as near as the union can determine there were between 50 and 60 members not eligible by reason of not having been employed the necessary length of time. Taking the largest figure of non-eligible employees so as to give the plaintiffs the benefit of any doubt that might exist, we thus determine from the evidence of plaintiffs them-

selves that the number of eligible employees in May 1953 was 372. Of that number 239 had the premium deducted from their salaries. This gives a total of approximately 64% of eligible employees paying premiums. The difference in membership is illustrated by the fact that 75% of 372 is 279, the number required to comply with the rider, and but 239 paid, a difference of 40.

With regard to the necessity of giving notice of intent to cancel for lack of 75% participation on May 1, 1953, as herein held by the majority, I feel that the meaning of the rider is clear. To me the provision of paragraph 3, that "If the number of insureds under said contract on May 1, 1953, is less than 75% of the eligible employees, said contract shall be cancelled as of May 1, 1953" expresses a condition precedent to defendant's liability under the contract. The next sentence of paragraph 3, "If the number of Insureds under said contract becomes less than 75% of the eligible employees on or after June 1, 1953, the Association reserves the right to cancel said contract on any premium due date by giving thirty days notice of intent to cancel" expresses a condition subsequent. To construe these provisions any differently, in my opinion, would be to adopt inconsistencies into the contract and to vary its terms. To require notice of intent to cancel for lack of 75% participation on May 1, 1953, would require the defendant either to know the percentage of participation prior to May 1, in order to give such notice in advance, which to me is manifestly an impossibility and an absurdity, or to give such notice on or after May 1, 1953, which would be of no advantage to plaintiffs because no claims arising after May 1, 1953, would be compensable anyhow, since the contract would become ineffectual as of May 1, 1953.

R.C.M. 1947, section 58-206, defines a condition precedent. It states: "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."

442

In 17 C.J.S., Contracts, section 338, it is said:

''A condition precedent in the law of contracts either may be a condition which must be performed before the agreement of the parties shall become a binding contract, or it may be a condition which must be fulfilled before the duty to perform an existing contract arises. * * *

''The question of whether stipulations in a contract constitute conditions precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation.''

The words of the contract here indicate that the parties intended the contract to be ineffectual if 75 % of the eligible employees were not enrolled in the insurance plan on May 1, 1953, and that if participation dropped below 75 % after June 1, 1953, the contract could be cancelled by giving 30 days notice of such intent.

While the majority hold the contract was ambiguous and that notice was required to be given to cancel as of May 1, 1953, for lack of 75 % participation, I feel that the evidence clearly indicates that such was not the intent. The reason the rider was adopted was to raise the amount and number of premiums paid to a point where the defendant was not operating at a loss. This was undisputed. In other words, the contract was not to be continued unless 75 % of the eligible employees participated. If the insurance could be continued for *any* period with less than 75 % participation, the rider was a useless and idle gesture; 75% participation was thus manifestly a condition precedent to the insurer's liability. The plaintiffs' union knew how many members it had. The agreement that was entered into required 75% of those eligible to participate. This was ''a condition * * * to be performed before some right dependent thereon accrues.''

Since the 75% participation requirement was a condition precedent to defendant's liability, and plaintiffs failed to al-

lege that such condition had been met, in my opinion, defendant's demurrer should have been sustained. A condition precedent must be alleged and proved, where the right of recovery is dependent on its happening. Broat Lumber Co. v. Van Houten, 66 Mont. 478, 480, 213 Pac. 1116; Binzel v. Viehmann, 111 Mont. 6, 10, 106 Pac. (2d) 187. Here, plaintiffs alleged only that the contract "was in full force and effect."

Aside from the pleadings, upon the trial plaintiffs offered no proof that the conditions precedent had been met.

For these reasons, since, in my opinion, the contract was not in force at the time the claims of plaintiffs arose, I would reverse the judgment of the District Court, and order the action dismissed.

MR. JUSTICE CASTLES:

I concur in the dissenting opinion of Mr. Chief Justice Harrison.