(No. 6978.   October 14, 1942.)

SHERMAN V. KNAUSS, Respondent, v. HARVEY S. HALE, Appellant.

[131 Pac. (2d) 292.]

Chapman & Chapman and James T. Murphy for appellant.

Rayborn & Rayborn and Harry Povey for respondent.

HOLDEN, J.—March 15, 1937, Harvey S. Hale and Sherman V. Knauss made an oral partnership agreement

for the purpose of buying, selling, raising, breeding, grazing, and dealing in sheep, under the firm name and style of "Hale & Knauss." About 11 months thereafter, to-wit, April 22, 1938, these parties entered into a written partnership agreement. The written agreement provided, among other things, as follows:

"Knauss furnishes his own labor without cost to the partnership and the labor of his brother, A. L. Knauss, without wage cost to the partnership until the partnership in the opinion of the bank is financially able to pay said brother when he will be paid going wages for full time employed; S. V. Knauss contributes without charge to the partnership the following equipment which is to be returned to him, or else a reasonable pay therefor when this partnership is dissolved; 3 horses, camp wagon, commissary wagon, saddle, harness, camp tools, and a 640 acre homestead on Mule Creek."

By its terms this written agreement was to expire September 1, 1938.

Sometime in August, 1938, "along about the time of the expiration of this contract", an oral understanding or agreement was reached for a continuance of the copartnership. Thereafter, serious differences arose between the members of the copartnership, as a result of which respondent Knauss commenced this suit for an accounting and for a dissolution of the copartnership. The case was tried commencing April 21, 1941. September 16, 1941, Findings of Fact and Conclusions of Law were made and filed settling the accounts of the partners between themselves and the copartnership, and on the same day a decree was entered thereon dissolving the copartnership. October 10, 1941, Hale prosecuted an appeal from the decree to this court.

While numerous errors are assigned, the pivotal question presented on this appeal is as to whether, as part of the oral agreement of the partners to continue the partnership, it was agreed respondent should be paid wages at the rate of $60 a month as found by the trial court. It is the contention of appellant that no such agreement was made, nor understanding reached, and that under the terms of the written copartnership agreement respondent was required to furnish "his own labor without any cost to the partnership"; that while respondent received $60 per month it was with the understanding it should be charged to respondent as an advancement "upon anticipated profits to

be thereafter distributed." On the other hand, it is the contention of respondent that it was agreed respondent should be paid $60 per month as "wages", and not as an advancement "upon anticipated profits to be thereafter distributed." On this decisive question attention is directed to the following testimony:

Respondent testified on direct examination:

"Q. Can you recall what—was you to continue on and did you agree to continue on practically as you had been?

"Q. Did you continue on in the sheep business after that date? [Referring to date contract expired.]

"A. Yes.

"Q. Did you have a conversation with Mr. Hale, the defendant, along about the time of the expiration of this contract, Mr. Knauss?

"A. Yes sir.

"Q. Did you have a conversation with him in reference to wages to be paid to you?

"A. Yes sir.

"Q. Will you state to the court what that conversation was?

"A. I couldn't—my financial—my wife was working at the laundry at that time and she couldn't keep up and I couldn't continue on so I told Mr. Hale I couldn't go on because my wife couldn't keep up the finances at home; that he'd either have to—I'd have to quit the sheep business or draw wages and he agreed to it.

"Q. What did he say in reference to that?

"A. Well he said that he was drawing good wages at that time and if I got out of the sheep business we would have to hire somebody to take my place, and I would take more interest than anyone else we could hire and I might as well draw wages.

"Q. Did he say what the wages would be?

"A. We agreed on sixty dollars per month.

"Q. And from that time on did you draw sixty dollars per month?

"A. Yes.

"Q. Up until when?

"A. I think October 19—I don't remember when the last check was.

\* \* \* \*

"Q. You said you drew wages up to October. Do you know what year that was, Mr. Knauss?

."A. Of 1940. I am not sure if that was the last check."

On cross-examination respondent testified:

"Q. Mr. Knauss, I believe you testified that you had some kind of arrangement under which you were to receive sixty dollars a month?

"A. Yes sir.

"Q. Now then as I understood you to testify, that occurred in September of 1938?

"A. Somewhere about in there.

"Q. Now I will ask you if as a matter of fact the first sixty dollar check you received was for the month of August, 1938?

"A. I wouldn't say for sure but I think it is.

"Q. Isn't that your best recollection?

"A. I think it is.

"Q. August of 1938?

"A. Yes.

* * * *

"Q. Prior to August, 1938, all that you received from the partnership was your board and the supplies used by you in performing your services for the partnership?

"A. Yes sir.

* * * *

"Q. Well in any event it became apparent to you in the summer of 1938 that you were not financially able to perform your services for the partnership?

"A. No, I couldn't go ahead, no.

"Q. And I will ask you whether or not in the summer of 1938 it was agreed between yourself and Mr. Hale that beginning with August '38 that you would be advanced the sum of $60 per month?

"A. For wages, yes sir, sometime about in that period there.

"Q. And that the sixty dollars per month which you were to receive would be ultimately charged against your profits, against any profits which you might receive from the partnership?

"A. Absolutely no."

Appellant testified on direct examination:

"Q. And what was that conversation, Mr. Hale?

"A. Well along in the summer of '38 Mr. Knauss and I were discussing things, talking things over and he said his wife wasn't making as much in the laundry as she had before and he had some extra bills to meet and he would have to have some money advanced to him if he was going to continue in the company and work for the company.

* * * *

"Q. Now going to the time, Mr. Hale—did you have then another conversation with Mr. Knauss with respect to the advance of the sixty dollars per month?

"A. We discussed it several times because I didn't think Mr. Painter would allow it at the bank.

"Q. And did you have any conversation with Mr. Knauss with respect to what Mr. Painter's attitude would be?

"A. Yes, we talked it over.

"Q. And what was that conversation?

"A. I told him I didn't think he would allow it but we would go see him and if he would it would be all right for him to draw that much in order to keep going.

"Q. Was there anything said in that conversation, Mr. Hale, that Mr. Sherman Knauss was to receive that money as salary or wages in addition to his interest in the partnership?

"A. Absolutely not: Just an advance.

"Q. Just what was said in the conversation with Mr. Knauss with respect to what this money was to be?

"A. We talked it over and it (was) thoroughly agreed that it would just be a cash advance to him and when we settled up whatever he drew out would be charged against him at the end of the settlement."

On cross-examination, appellant testified:

"Q. I believe you stated this morning, Mr. Hale, that you told Mr. Knauss at the time you talked with him in August of '38 that the payment to him of $60.00 per month —that you would have to talk it over with Mr. Painter or something to that effect, is that correct?

"A. Yes.

"Q. Did you ever discuss that with Mr. Painter?

"A. I think I did. I am not too positive.

"Q. But you went ahead and paid him just the same?

"A. Yes, my recollection is that I did discuss it but I wouldn't be absolutely positive."

Roy Painter, cashier of the Fidelity National Bank of Twin Falls, who kept the books of the partnership, testified:

"A. Mr. Hale first said to me: 'Sherm has got to have some money,' and thereafter each month that was put into the budget by him in writing.

"Q. Thereafter, Mr. Painter, did you have any further conversation from which you ascertained that arrangement under which the $60.00 was being put up?

"A. No sir, I never discussed it with them particularly.

* * * *

"Q. Now then, Mr. Painter, during that time did you discuss with Mr. Knauss and Mr. Hale individually and jointly the matter of the budgets and accounts of the partnership?

"A. Many a time, yes sir.

* * * *

"Q. And from those many conversations, Mr. Painter, did you become familiar with the arrangement under which the $60.00 was being advanced to Sherman?

"A. Well I O.K.'d the budget each month that contained that amount.

"Q. Was that advance made, Mr. Painter, as wages for Sherman Knauss or as an advance on his partnership interest?

"A. I never discussed the definition of it from that standpoint, whether it was labor or advances. I never looked into it. I just never thought of it. I labeled it "labor" so that the stenographer could sort out each check and each disbursement under the proper heading. My definition of it did not come from a conversation with either one of these men.

* * * *

"Q. And during all this time you kept the accounts of the partnership and rendered to them statements every month?

"A. Yes, that statement I had made up for my own use primarily and almost with equal purpose I wanted Mr. Knauss to know exactly what every cent was used for and

I wanted Mr. Hale and Mr. Knauss to know that I was trying to sit on the lid."

This evidence discloses that in August, 1938, "along about the time of the expiration of this contract" [written partnership agreement], respondent and appellant discussed the matter of respondent's pressing "living" needs and necessities—about that there is no dispute; nor is there any dispute that it was orally agreed the partnership was to be continued. There is, however, a decided dispute as to the condition upon which the partnership was to be continued; that is to say, whether it was orally agreed the partnership was to be continued upon the condition that Knauss would be paid $60 per month as wages, or whether it was orally agreed the partnership would be continued upon the condition that Knauss should receive $60 per month as an advancement "upon anticipated profits to be thereafter distributed." Knauss says that he "told Mr. Hale I couldn't go on because my wife couldn't keep up the finances at home; that he'd either have to—I'd have to quit the sheep business or draw wages and he agreed to it", and that Hale said "if I got out of the sheep business we would have to hire somebody to take my place, and I would take more interest than anyone else we could hire and I might as well draw wages", and that "we agreed on $60 a month." On the other hand, Hale says that "we talked it over and it (was) thoroughly agreed that it would just be a cash advance to him (Knauss) and when we settled up whatever he drew out would be charged against him at the end of the settlement". And Roy Painter, the bookkeeper, testified that he labelled it, the Knauss $60 item, "labor", "so that the stenographer could sort out each check and each disbursement under the proper heading. My definition of it did not come from a conversation with either one of these men." Painter also testified that Hale came to him and said "Sherm [meaning Knauss] has got to have some money", and that "thereafter each month that [referring to the Knauss item of $60] was put into the budget by him in writing". Painter further testified that during all the time he kept the accounts of the partnership he "rendered to them [Knauss and Hale] statements each month".

Respondent's testimony to the effect the partnership was continued on the condition he was to be paid $60 a month as wages is supported by these circumstances: That

each month Painter rendered appellant a statement showing that respondent was getting $60 for and as "labor", and not as an advancement "upon anticipated profits to be thereafter distributed". If the Painter statements were incorrect in that particular, it is rather strange, to say the least, that appellant made no attempt to have them corrected so that they would show what he now claims to be the fact.

In the case at bar there is conflict in the testimony of respondent and appellant. As this court pointed out in *Bussell v. Barry*, 61 Ida. 350, 353, 102 Pac. (2d) 280, "the trial judge had an opportunity to hear the testimony of the witnesses and to observe their demeanor while testifying, and was in better position than we are to decide as to who was telling the truth". It was then held that: "Where the evidence in support of a finding of the trial judge, if uncontradicted, would be sufficient to sustain it, it will not be disturbed because of conflict."

We turn now to appellant's contention the trial court erred in finding "that all monies expended on and for the benefit of the homestead of plaintiff [respondent] were for the use and benefit of the partnership and not chargeable against the plaintiff."

It appears respondent agreed to contribute without charge to the partnership "a 640 acre homestead on Mule Creek". It further appears the partnership expended monies in constructing a reservoir, cistern, and in making other improvements on the homestead. The reservoir and cistern were constructed and other improvements made for the use of the copartnership and they were used by the copartnership. The trial court apparently took the view that inasmuch as the improvements were made for the use of the copartnership and that the copartnership used them and benefitted therefrom, the expense of making the improvements was not chargeable against the respondent.

There is no evidence in the record that respondent agreed to pay for the improvements and, indeed, appellant does not so contend. Appellant, of course, knew at the time the improvements were made it would be impossible, for instance, to remove either the reservoir or the cistern at the termination of the copartnership. Hence, if appellant had not considered the use of the improvements would be worth the amount they would cost the partnership, it seems fair to assume he would, before or at the time they were made, have insisted upon an agreement or understanding concern-

ing the matter. Instead, he waited until this suit was commenced to demand the cost of making such improvements be charged to respondent.

Furthermore, the situation here, involving the matter of compensation for making the improvements in question, is somewhat analagous to the situation created where a tenant, in the absence of an agreement, voluntarily places improvements upon a leasehold. It is the general rule that where improvements are so made by a tenant, he is not entitled to compensation from his landlord. (*McKeen v. Brooks,* 178 Pac. 745, 55 Mont. 483, (Supreme Court of Montana) ; *Gay v. Joplin,* 13 Fed. 650, 4 McCrary 459; *Diederich v. Rose* (Supreme Court of Illinois), 238 Ill. 610, 81 N.E. 1140, 1142; 2 Tiffany on Landlord & Tenant, sec. 270, p. 1692.)

Appellant further contends the trial court erred in its allowances for services rendered the partnership by respondent's wife and his brother, Lester. Concerning these allowances, there is a substantial conflict in the evidence. Hence, the findings thereon will not be disturbed.

The decree is affirmed with costs to respondent.

Givens, C.J., and Budge, Morgan and Ailshie, JJ., concur.