683 P.2d 854

E. Drew **CROWLEY** and Galbraith & Green, Inc. of Idaho, an Idaho corporation, Plaintiffs, Counterdefendants, Respondents,

v.

The **LAFAYETTE LIFE INSURANCE COMPANY**, a foreign corporation, Defendant, Cross-Defendant, Counterclaimant, Appellant,

and

Trustees of the Packing House Division of Amalgamated Meat Cutters, Employee Union Local 368 Trust, unincorporated association, said trustees being, Lewis Sorini, Richard Keim, Lamont Baker, Sam Nettinga, Eldon Adams, Everett Grimes and Elvin Hightower, Defendants, Counterclaimants, Crossclaimants.

No. 14569.

Supreme Court of Idaho.

June 7, 1984.

Richard C. Fields, and Glenna M. Christensen, of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant, cross-defendant, counterclaimant, appellant.

John P. Howard, of Quane, Smith, Howard & Hull, Boise, for plaintiffs, counterdefendants, respondents.

DONALDSON, Chief Justice.

The Amalgamated Meat Cutters Union Local 368 Trust (Trust) was created to provide medical benefits to participating Union members and their families. Respondents, Galbraith & Green, Ìnc. and its President E. Drew Crowley (Crowley), were hired by the Trust as consultant and plan manager. In May, 1976, the Trustees decided to establish a self-funded insurance program to provide the desired benefits, and directed Crowley to obtain reinsurance coverage which would reimburse the Trust for major claims which it might be required to pay.

Two types of reinsurance were provided by appellant Lafayette Life Insurance Co. (Lafayette) to the Trust. The first type was aggregate excess reinsurance (aggregate reinsurance) designed to reimburse the Trust when the aggregate net claims exceeded a stated amount during the contract year. The second type was specific excess reinsurance (specific reinsurance) which was designed to reimburse the Trust for any large individual claims it was required to pay. Under the specific reinsurance, the Trust was solely responsible for the first $15,000.00 of any individual claim. Appellant Lafayette would reimburse the Trust for eighty percent (80%) of any claim in excess of $15,000.00 paid by the Trust during the contract year. Both types of reinsurance had an effective date of June 1, 1976. In addition to the reinsurance, the Trust also obtained a group life insurance policy from Lafayette to cover the Union members.

The initial agreement as to all three types of insurance was reached prior to June 1, 1976. Thereafter, on July 2, 1976, Crowley submitted a group insurance application and a binder premium in the sum of $2,000.00 to Lafayette. The signing of the written contracts by Lafayette's representative took place on October 18, 1976, and the chairman of the Trust signed the written contracts on behalf of the Trust on December 1, 1976.

The premiums for the specific reinsurance were based on the number of employees and dependants enrolled in the plan each month. Lafayette, on September 8, 1976, mailed Crowley the forms used to compute the monthly premium for the specific reinsurance. On October 19, 1976, Lafayette advised Crowley by mail that no premium for the specific reinsurance had been received, and asked for payment. Another letter was sent dated December 3, 1976, again asking for payment on the specific reinsurance, and declaring Lafayette's intention to "cancel" the contract if payment of the premium was not forthcoming. No monthly premium payments were ever received for the specific reinsurance (apparently due to a misunderstanding on the part of one of Crowley's employees), and, on February 11, 1977, Lafayette notified Crowley that the specific reinsurance had been canceled retroactive to June 1, 1976, for nonpayment of premium. As of February 11, 1977, no individual claims had arisen which exceeded $15,000.00.

Several claims arose after February 11, 1977, which eventually exceeded $15,000.00. Lafayette refused to reimburse the Trust for the amount in excess of $15,000.00, claiming that the specific reinsurance had been rescinded previously. Crowley filed suit for declaratory judgment for a declaration of rights under the insurance policies. Both Lafayette and Crowley subsequently moved for summary judgment. The district court granted partial summary judgment declaring

"that Lafayette Life failed to unilaterally cancel the policy in accordance with the express provisions of the policy and that the policy was still in force when the claims arose unless it is proven at trial that it was mutually cancelled, and, if so, whether such cancellation, if any, was pursuant to the policy and therefore not retroactive, or by a new contract made outside of the provisions of the policy which would operate retroactively."

Prior to trial, Lafayette and Crowley, recognizing that one or the other was liable to the Trust for payment of the excess claims, entered into an agreement with the Trustees settling all claims of the Trust against the parties. Pursuant to that settlement agreement, Lafayette and Crowley each paid $75,000.00 to the Trust. Subsequently, the district court granted Crowley's motion for summary judgment on the remaining issues. This appeal followed.

Lafayette Life sets forth three main contentions on appeal. Initially, Lafayette argues that it properly rescinded the specific reinsurance agreement. Secondly, Lafayette contends that it substantially complied with the termination provisions of the specific reinsurance agreement. Finally, Lafayette asserts that Crowley, as agent

for the Trust, consented to the termination of the specific reinsurance agreement.

■ Before addressing the issues as set out above, we note that our standard of review is well established. Summary judgment is to be granted only after the facts contained in the pleadings, depositions, admissions, and affidavits have been construed most favorably to the nonmoving party, and it is clear that there is no genuine issue as to any material fact. *Anderson v. Ethington*, 103 Idaho 658, 651 P.2d 923 (1982); *Huyck v. Hecla Min. Co.*, 101 Idaho 299, 612 P.2d 142 (1980); I.R.C.P. 56(c).

## I.

### RESCISSION

It is Lafayette's position that it was entitled to rescind the specific reinsurance agreement pursuant to general contract law. Lafayette begins by asserting that it is important to distinguish reinsurance contracts from common insurance policies. Based upon this distinction, Lafayette argues that although an individual consumer who obtains an insurance policy is entitled to some degree of judicial protection, an insurer who obtains a reinsurance contract is not entitled to that same degree of judicial protection since there is generally no disparity between the bargaining power of the reinsured and the reinsurer. Therefore, Lafayette contends that the rules of strict construction which are held to be applicable to common insurance policies should not be applied herein, but rather general contract principles should be applied. Lafayette concludes by asserting that rescission is available to one party where there has been a failure of consideration by the other party to the contract, and that Lafayette was entitled to rescind the specific reinsurance agreement because

there was a failure of consideration in that the Trust, as of February 11, 1977, had failed to make any of the monthly premium payments on the specific reinsurance.

■ Rescission is equitable in nature and is intended to place the parties in the positions they occupied prior to the contract. Furthermore, rescission is available only when one of the parties has committed a material breach which destroys the entire purpose for entering into the contract. *Blinzler v. Andrews*, 94 Idaho 215, 485 P.2d 957 (1971). Also important herein is the rule of law that the party desiring to rescind a contract must, prior to rescinding, tender back to the other party any consideration or benefit received under the contract by the rescinding party. *Haines v. Rowland*, 35 Idaho 481, 207 P. 428 (1922); *see generally* 17 Am.Jur.2d *Contracts* § 512 (1964); 17A C.J.S. *Contracts* § 439 (1963).

■ It is undisputed that sometime during May, 1976, an agreement (presumably oral) was entered into between Lafayette and Crowley, who was acting for the Trust. According to this agreement, Lafayette was to provide the three types of insurance coverage discussed above effective June 1, 1976. Crowley did not submit an application for these three types of insurance until July 2, 1976, more than one month after coverage had begun.[1] Furthermore, Lafayette did not sign the two reinsurance agreements until October 18, 1976, and the representative of the Trust did not sign these two agreements until December 1, 1976. However, both Crowley and Lafayette agree that beginning June 1, 1976, Lafayette was providing coverage. Therefore, we do not view the two reinsurance agreements and the group life insurance policy as separate agreements, but rather as terms of the original agreement reached during May, 1976. As such, the $2,000.00

---

**1.** Lafayette argues that this application was for the group term life insurance only. However, the application does not so indicate. Furthermore, the section of the application in which the applicant is to indicate the type of coverage sought instructs the applicant to list under "Additional Information" any coverage not express-

ly set-out in the coverage section. Crowley did so by listing both the aggregate reinsurance and the specific reinsurance under the section entitled "Additional Information." Thus, Lafayette's contention is unsupported, and the application was an application for all three types of insurance.

"binder premium" submitted with the application should have been treated by Lafayette as a binder on all three types of coverage. However, Lafayette treated the binder as applicable only to the group term life insurance, and thus argues that no compensation had ever been received for the specific reinsurance coverage.

■ Although we acknowledge that Crowley failed to pay any of the monthly premiums on the specific reinsurance, we do not feel such failure was a breach so material that the *entire purpose* for entering into the May agreement was destroyed. To the contrary, Lafayette had received substantial premiums on both the aggregate reinsurance portion of the agreement and the group life insurance portion of the agreement. Furthermore, assuming arguendo that the specific reinsurance portion of the agreement was severable, and therefore subject to recission only as to that part, Lafayette failed to properly rescind this portion of the agreement by failing to return that portion of the binder premium which was applicable to the specific reinsurance. Under the specific facts of this case, we feel that it would be inequitable, and contrary to the law, to hold that Lafayette was entitled to rescission of the specific reinsurance. Therefore, we affirm the district court's holding that Lafayette was not entitled to rescind the specific reinsurance.

## II.

### CANCELLATION

Lafayette's second argument is that it effectively canceled the specific reinsurance by substantially complying with the cancellation provisions applicable to the specific reinsurance. The cancellation provisions applicable to the specific reinsurance provided as follows: "This agreement shall continue in effect until terminated by mutual consent, or by either party's giving to the other party not less than 60 days notice by registered mail, stating the termination date."

■ Generally speaking, provisions for notice of cancellation of insurance policies are intended to prevent cancellation of the policy without allowing the insured ample opportunity to obtain other insurance. *Cantrell v. Benefit Association of Railway Employees,* 136 Mont. 427, 348 P.2d 345 (1960); *Moore v. Vernon Fire & Casualty Insurance Co.,* 142 Ind.App. 334, 234 N.E.2d 661 (1968); 43 Am.Jur.2d *Insurance* § 389 (1982). None of the letters which Lafayette argues provided notice in compliance with the termination provisions gave 60 days notice as required by the termination provisions. Furthermore, the termination date stated in those letters was June 1, 1976.

Lafayette argues that the termination provisions for the specific reinsurance entitled it to retroactively terminate the policy. However, the termination provisions applicable to the specific reinsurance do not provide for retroactive termination. We conclude that Lafayette failed to comply with the termination provisions applicable to the specific reinsurance by failing to give 60 days notice, and by attempting to terminate retroactively. Therefore, we affirm the district court's holding that Lafayette's attempted cancellation was ineffective.

## III.

### MUTUAL CONSENT TO TERMINATE

■ Lafayette also argues that the specific reinsurance was terminated by mutual consent. It is Lafayette's contention that Crowley consented to the cancellation of the specific reinsurance by failing to object to Lafayette's cancellation. However, after reviewing the record in the light most favorable to Lafayette, we are unable to find sufficient facts from which reasonable minds could conclude that Crowley consented to Lafayette's cancellation. Therefore, we affirm the district court's holding that there was no mutual consent to cancel this specific reinsurance.

## IV.

Finally, Lafayette asserts that respondents' memorandum of costs should have

been stricken by the trial court because the memorandum of costs was filed prematurely. The memorandum of costs herein was filed on March 16, 1982. Thereafter, on March 26, the trial court filed its Memorandum Decision and Judgment, and Lafayette filed an objection to a portion of respondents' memorandum of costs. Finally, on April 5, Lafayette filed a motion to strike all costs on the basis of the premature filing of the memorandum of costs.

I.R.C.P. 54(d)(5) provides that a memorandum of costs is to be filed any time after a decision of the court, and not later than ten days after entry of judgment.[2] I.R.C.P. 54(d)(6) states that a motion to disallow part or all of any costs claimed by another party is to be filed within ten days of the service of the memorandum of costs.[3] Both of the parties herein base their arguments upon the strict language contained in these two rules. However, we base our holding herein upon the strong policy behind these rules.

■■■ The Rules of Civil Procedure were adopted to renounce the strict rules of Code pleading which existed at common law. Consequently, this Court in *Wheeler v. McIntyre*, 100 Idaho 286, 596 P.2d 798 (1979), unanimously determined that the strict ten-day period of I.R.C.P. 54(d)(6) may be enlarged at the discretion of the trial court. In a similar vein, we can conceive of no prejudice to any party which would result from considering a memorandum of costs filed prior to a decision of the court to become valid upon the date the clerk of the court files the decision. *Compare* I.A.R. 17(e)(2). Consequently, we hold that the premature filing of the memorandum of costs in this case does not constitute a ground for striking the memorandum of costs.[4] Therefore, we affirm the district court's denial of Lafayette's motion to strike the memorandum of costs.

Judgment of the district court affirmed.

Costs on appeal to respondents.

No attorney fees on appeal.

SHEPARD, BISTLINE and HUNTLEY, JJ., and WALTERS, J. Pro Tem., concur.

---

2. "Rule 54(d)(5).—Memorandum of Costs.— At any time after the verdict of a jury or a decision of the court, any party who claims costs may file and serve on adverse parties a memorandum of costs, itemizing each claimed expense, but such memorandum of costs may not be filed later than 10 days after entry of judgment. Such memorandum must be verified by the oath of the party or his attorney stating that to the best of his knowledge and belief the items are correct and that the costs claimed are in compliance with this rule. Failure to file such memorandum of costs within the period prescribed by this rule shall be a waiver of the right of costs."

3. "Rule 54(d)(6). Objections to costs.—Any party may object to the claimed costs of another party set forth in a memorandum of costs by filing and serving on adverse parties a motion to disallow part or all of such costs within 10 days of service of the memorandum of cost. Such motion shall not stay execution on the judgment, exclusive of costs, and shall be heard and determined by the court as other motions under these rules. Failure to timely object to the items in the memorandum of costs shall constitute a waiver of all objections to the costs claimed."

4. We note that this holding does not in any way affect the requirement of I.R.C.P. 54 (d)(6) that any objections to costs must be filed within 10 days of the service of the memorandum of costs.