718 P.2d 1227
**Gary V. OLSEN,
Plaintiff/Appellant/Cross-Respondent,**

**v.**

**COUNTRY CLUB SPORTS, INC., an Idaho corporation, Robert F. Whitacre, Sr., and Michael P. Groth.**

**No. 15659.**

Court of Appeals of Idaho.

Sept. 6, 1985.

On Denial of Petition for Rehearing
May 1, 1986.

Simon Martin of Hansen, Boyle, Beard & Martin, Idaho Falls, for appellant.

W. Joe Anderson of Sharp, Anderson, Bush & Nelson, Idaho Falls, for respondents.

Before BAKES, Acting C.J., and BIST-LINE and OLIVER, Acting JJ.

BISTLINE, Acting Judge.

## HISTORY

In 1978, defendants Robert Whitacre and Michael Groth became interested in building a skating facility in Idaho Falls. Therefore, they formed the defendant corporation, Country Club Sports, Inc., for the purpose of acquiring financing for this project. Their search for financing led them, in the summer of 1980, to Gary Olsen, the plaintiff in the action.

After discussing the project, Olsen, Whitacre, and Groth agreed to the following: Olsen would finance the construction of an ice skating facility and then lease it for a fifteen-year term to Country Club. On June 18, 1980 the parties entered into this lease. At the same time Whitacre and Groth individually guaranteed the obligations under the lease in which Country Club had entered.

Olsen spent approximately $465,000 to finance construction of the facility. As part of the provisions under the lease, Country Club furnished $100,000 in ice skating equipment. The corporation also supplied $35,000 in building materials.

From day one the ice skating facility has, apparently, been an unsuccessful venture, and, by February 1981, Country Club was in arrearage in rent in the amount of $106,-000. On February 24, 1981 the parties formally acknowledged that Country Club was in default of the original lease and renegotiated terms, effective February 1, 1981. Things fared no better, however, and by April 1981 Country Club was again in arrearage on rent payments in the amount of $36,565.11. Accordingly, on April 24, 1981, Olsen served Country Club, Whitacre, and Groth with a Notice of Breach of Lease Agreement. Therein Olsen demanded payment of all rent then due within five days of receipt of the notice;

referred to that provision of the Lease Agreement that if rent arrearages were not paid within the five days such would constitute a default; declared a default for the non-payment; and, of great importance, concluded with the following:

8. Exercise of Rights on Default.

Gary Olsen as lessor under the lease agreement *hereby exercises his option to terminate and forfeit the lease immediately upon such default.* Gary Olsen *hereby exercises his right to immediately re-enter the leased premises upon the occurrence of a default and shall thereupon immediately assume possession and control of the leased property.* Gary Olsen as lessor hereby elects to immediately accelerate all rent under both the lease agreement and the supplement agreement to become due after default so that it shall then be due and payable. Upon such default, lessor also elects to take possession of the personal property subject to the security interest given in paragraph IVB of the lease agreement pursuant to Idaho Code Section 28-9-503. Gary Olsen as lessor will then proceed to sell the personal property subject to the security interest under such terms and conditions as are required by the lease and by the Idaho Uniform Commercial Code. *Also, Gary Olsen as lessor shall seek to re-lease* the premises and otherwise mitigate damages and will proceed to enforce collection of the total amount of rent then due under the terms of the lease agreement.

Plaintiff's Exhibit 5 (emphasis added).

Country Club failed to pay the rent due. Thereafter, on May 19, 1981, Olsen's counsel sent a letter to counsel for the defendants. In the letter, Olsen's attorney stated the following:

It is our understanding Country Club Sports, Inc., Robert F. Whitacre, Jr., Robert F. Whitacre, Sr., and Mike Groth are not able to meet current commitments to keep the Idaho Falls Ice Arena open. On April 25, 1980 a notice of

breach of lease agreement was served upon your clients. The defaults mentioned in that notice have not been corrected.

In order to mitigate damages, we request your clients *immediately surrender* possession of the Idaho Falls Ice Arena. We would like to effect the transition today. Gary Olsen will assume possession of the Idaho Falls Ice Arena, will pay for power to be delivered in the future, will retain the current staff, at least temporarily, and will otherwise take such action as is necessary to keep the facility open through approximately June 15. It is his intention to have the ice arena operate throughout the duration of the scheduled figure skating classes. He anticipates closing the ice arena approximately June 15. It will remain closed through the remainder of the summer and will open again approximately September 1.

During the summer, he anticipates installing a second compressor, making repairs, and contracting for management of the facility. Although he would like to permit your clients to re-establish their position as lessees, he cannot make a long term commitment to do that without seriously affecting his ability to obtain a full time manager. It would be difficult, if not impossible, to obtain a full time manager if his employment could be affected at any time by your clients deciding to resume their position as lessee.

*Gary Olsen is only willing to permit your clients to re-establish their position as lessee* at times prior to August 29, 1981.

*In order to re-establish their position as lessee,* your clients would have to pay all sums now due under the lease or that might become due under the lease as if it were continuing to be performed through August 28, 1981. In addition, they would need to pay Gary Olsen for all his costs and expenses, capital or otherwise,

incurred by him between now and August 28 in the operation, repairs, maintenance, refurbishing or expansion of the facility, less any receipts received.

. . . .

... Please do not infer the *request to surrender* possession nor the granting of a limited right for your clients to *reinstate their position as lessee* are a waiver of any right by Gary Olsen. He is waiving no right he may have against your clients. *He is only trying to mitigate damages and grant a new right—the right of reinstatement exercisable prior to August 29, 1981.* Gary Olsen, may and probably will seek recovery of damages because of the present defaults. If your clients fully reinstate their position as lessee, my client may at that time consider it in his best interests to discontinue any then pending suits.

We would like possession *surrendered* today and as orderly a transition as possible. If possession has not been *surrendered* by 5:00 p.m. today, we will proceed to obtain possession by judicial determination. We hope that additional expense will not be necessary.

R., Vol. 3, pp. 91–92 (emphasis added).

The defendants complied with this letter, and Olsen took possession of the skating facility. Olsen did no better in getting the ice skating facility to turn a profit, and ultimately shut it down in June 1982. He was, however, able to account back to the defendants, in mitigation of damages, $64,-101.84 from sale of the liened personal property. On December 1, 1982 this suit was filed, with Olsen seeking damages for rent due upon default, which included that rent which was accelerated pursuant to the provisions of the lease plus all unpaid rent, less that which he was able to offset plus expenses saved, the amount sued for being in excess of one million dollars.

Both parties filed motions for summary judgment, and on February 28, 1984 the district court (1) ruled against the defendants' affirmative defenses of unconsciona-

bility and improper mitigation of damages; and (2) ruled that the defendants surrendered the leasehold, and that this surrender eliminated all obligations and damages arising after the surrender. The court, however, reserved for trial the issues of when the surrender occurred and what offsets should be allowed to reduce Olsen's claim of damages against the defendants.

A trial was held before the district court without a jury. The court determined the date of surrender to be August 29, 1981, and, accordingly, calculated damages to be $77,607.72, which included unpaid rent, interest, costs, and attorney's fees [1] that had accrued up to the surrender date. Both parties have appealed the trial court's rulings.

## I.

Before addressing the substantive issues of this case, it is necessary to restate the proper standard of review. In particular, we address the review we have undertaken with respect to the parties' motions for summary judgment, and the district court's findings in resolving the issues.

### A.

As our Supreme Court has declared, a summary judgment is only to be granted when all the facts contained in all the applicable pleadings, depositions, admissions, and affidavits have been construed most favorably to the nonmoving party, and it is clear that there is no genuine issue as to any material fact. *Crowley v. Lafayette Life Ins. Co.*, 106 Idaho 818, 821, 683 P.2d 854, 857 (1984). Further, summary judg-

ments should be invoked with caution. *Steele v. Nagel*, 89 Idaho 522, 528, 406 P.2d 805, 808 (1965).

Where both parties file motions for summary judgment based on the *same* evidentiary facts and on the *same* theories and issues, the case is proper for resolution upon the merits. *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 518–19, 650 P.2d 657, 660–61 (1982).

### B.

■ Cases are legion which hold that whether there has been a surrender by operation of law—the main issue before us—depends upon the parties' intent, as manifested by their words and acts. *See* 51C C.J.S. *Landlord & Tenant*, § 126, p. 407 and cases cited therein; 49 Am.Jur.2d *Landlord & Tenant*, § 1100, p. 1055 and cases cited therein. This determination is necessarily a factual one. 51C C.J.S. *supra* at 407.[2] Accordingly, on appellate review the appellant must persuade us that the district court findings are clearly erroneous. Rule 52, I.R.C.P. With that appropriate standard of review kept in mind, we turn to the issue of surrender.

### II.A.

■ A surrender of a lease is the yielding up of a *tenancy* to the lessor before the end of the tenancy called for in the applicable lease. A surrender occurs and the tenancy is submerged and extinguished either by agreement or by operation of law. 49 Am.Jur.2d *Landlord and Tenant* § 1094, p. 1051.

■ As a result of a surrender, all rights and responsibilities which would otherwise

---

1. The attorney's fees were awarded pursuant to a provision in the lease.

2. In *Ehlert v. Woods,* 57 Idaho 218, 63 P.2d 1000 (1936), this Court was confronted with the issues of whether a surrender of a four-year lease involving farm land had occurred, and if it had, when it occurred. In writing for the majority, Justice Ailshie affirmed the trial court's finding, however, that the surrender had occurred on September 15, 1931, stating that there was not

"substantial" evidence in the record to sustain the lower court, but rather the evidence in the record showed that August 4, 1931 was the surrender date. *Id.* at 224, 63 P.2d at 1002. In *Ehlert,* the court treated both issues as factual ones, and employed a standard of review that inquired only into whether substantial evidence in the record existed by which the court could affirm the lower court's findings.

accrue after the date of surrender under the lease are extinguished. Thus, for example, when a surrender occurs, the lessee need not pay any rent which has not accrued as of the date of the surrender. *See, e.g., Ehlert v. Woods, supra* at 223, 63 P.2d at 1001.

■ We have underscored the words "tenancy" and "leasehold" to emphasize that it is the *lease agreement* and all rights and responsibilities flowing from it which are surrendered. This is to be contrasted with the tenant's mere abandonment and the lessor's re-entering—the point being that *mere* re-entering does not necessarily constitute acceptance of a lessee's tendered surrender.

As mentioned above, a surrender occurs by mutual agreement or operation of law. It is undisputed that here there was no mutual agreement of surrender. Accordingly, the defendants had the burden of establishing to the satisfaction of the trial court that the conduct of the parties, in this case particularly that of Olsen, was such that as a matter of law a surrender of the lease has indeed taken place. 49 Am.Jur. *supra* at § 1095, p. 1052. The focus of the inquiry on the lessor's conduct and words is to ascertain whether or not such are inconsistent with the continuation of the tenancy. If so, there may be a surrender as a matter of law, notwithstanding that the lessor may have actually intended the contrary. Surrender of a lease as a matter of law is not unlike the principle of quasi-contract wherein a court is not concerned with the intent or agreement of the parties. *See Continental Forest Products, Inc. v. Chandler Supply Co.,* 95 Idaho 739, 518 P.2d 1201 (1974). Our review of the district court decision is simply to discern whether the facts support its conclusion that the lease was surrendered.

■ The trial court correctly noted that where a lessee has breached a lease before expiration of the lease's term has occurred, the lessor, at common law, had three reme-

dies: (1) treating the lease as terminated and resuming possession; (2) retaking possession of the premises for the benefit of the lessee, and holding the lessee liable for the difference in rent between what he or she in good faith was able to recover by reletting the premises and what was due under the lease; and (3) doing nothing and collecting the full rent due under the lease. *Centurian Development Ltd. v. Kenford Co.,* 60 A.D.2d 96, 400 N.Y.S.2d 263 (1977).

The trial court also correctly noted that the third option is no longer as viable as in former times, at least in some contexts. In *Industrial Leasing Corp. v. Thomason,* 96 Idaho 574, 532 P.2d 916 (1974), our Supreme Court provided us with the guidance of this holding:

We therefore hold that the lessor of personal property is not unconditionally entitled to the full amount of the rentals reserved in the lease as damages in the event of breach of the lease. If the leased property is of such a kind that the lessor may reasonably anticipate the existence of a market for its re-lease or sale, the lessor is under a duty to use "commercially reasonable" efforts to re-lease or sell the property to mitigate damages according to the following rules:

1. If the lessee notifies the lessor of his intention not to continue the lease, or if the lessor becomes aware of the lessee's intention not to perform the lease by breach or otherwise, and if the leased property is returned to the lessor or made available to the lessor, then *the lessor is under a duty to attempt to mitigate the damages sustained by the lessee's breach by re-leasing or selling the property* and setting off the amount received against the damages sustained by reason of the lessee's breach of the lease. If a good faith attempt to rent or sell the property proves fruitless, the lessor is entitled to his full rental payment, plus expenses reasonably incurred in attempting to re-lease or sell the prop-

erty less expenses of performance saved by the breach (e.g., costs of maintenance, insurance, etc.). If the property is re-leased in good faith (i.e., at a rate or price which is commercially reasonable under the circumstances of the case), the lessor's damages are the rental called for in the breached lease, together with the reasonable expenses of preserving the property and re-leasing it, less the amount received in mitigation by the re-lease and any expenses of performance saved by the breach of the lease. *See Bennett v. Associated Food Stores, Inc.,* 118 Ga.App. 711, 165 S.E.2d 581 (1968); *see also,* Uniform Commercial Code— Sales, Part 7, Remedies, I.C. §§ 28–2–701 to 28–2–710, for treatment of the analo-gous problem under the law of sales.

*Id.* at 577, 532 P.2d at 919 (footnote omitted) (emphasis added).[3]

Thus, in determining whether Olsen's conduct or words were inconsistent with a continuation of the lease, it is clear that *mere* entering and reletting may not in and of itself constitute an act inconsistent with the lease, nor be characterized as an act on the lessor's part demonstrating an intent that there be a surrender of the lease; it would be anomalous to flatly hold that such acts are inconsistent with the lease when they may be required by law.

the lease was surrendered is sustained by the evidence. In addition to re-entering the premises, *and not re-letting,* Olsen took control of the business which had been theretofore operated by the lessees. Olsen stated several times in his letter of May 19, 1982—when he declared the lessees to be in default—that the lessees could only *"re-es-tablish their position as lessee"* if they would pay up the amounts due. We are aware that the "surrender" demanded was of possession. But, allowing the lessees to "re-establish" their position as lessees carries with it the connotation that until such re-establishment was offered and ac-cepted, they were not lessees in the inter-im. The record is clear, too, that the les-sees never were re-established as lessees. The reasonable conclusion to be drawn, then, from Olsen's May 19 letter is that Olsen was there doing that which he threatened to do in his April 24 notice of breach—terminating and forfeiting the lease.[4] Terminating a lease by the party entitled to do so is the equivalent of accept-ing the lessees' surrender of the lease. The surrender requested was not of the lease, but of possession. The surrender was by operation of law. Tenant was told to move out, did, and lessor went in—not to re-lease—but to take over the premises and business as well.

### B.

■ Our review of the record convinces us that the district court's conclusion that

### III.

■ The second issue we confront is whether the district court was correct in

---

**3.** While the Supreme Court formulated this rule in the context of a lessor-lessee dispute involv-ing *personal property,* we do not see why it is not applicable to a lease involving *real property.*

**4.** It is important to remember exactly what Ol-sen threatened to do in his April 24 notice. That notice reads in pertinent part:

Gary Olsen, as lessor under the lease arrange-ment, hereby exercises his option to terminate and forfeit the lease immediately upon such default. Gary Olsen hereby exercises his right to immediately re-enter the leased premises upon the occurrence of a default and shall thereupon immediately assume possession and control of the leased property. Gary Ol-sen, as lessor, hereby elects to immediately accelerate all rent to become due after default

so that it shall then be due and payable. Upon such default, lessor also elects to take possession of the personal property subject to the security interest given in paragraph IV–B of the Lease Agreement pursuant to Idaho Code § 28–9–503. Gary Olsen, as lessor, will then proceed to sell the personal property the subject of the security interest under such terms and conditions as are required by the lease and by the Idaho Uniform Commercial Code. Also, Gary Olsen, as lessor, shall seek to re-lease the premises and otherwise miti-gate damages and will proceed to force the collection of the total amount of rent then due under the terms of the Lease Agreement.

R., Vol. 3, pp. 88–89 (emphasis added).

determining August 29, 1981 as the surrender date. The defendants-lessees contend that the correct date should be May 19, 1981—the day of Olsen's default letter and the day he assumed operation of the lessee's business. We are persuaded to that view. As pointed out above, *see* part II, B., *supra,* on May 19, 1981, Olsen declared the lessees to be in default. He requested the lessees to "surrender" possession and stated that they could only "re-establish" their position as lessees if the overdue rent was paid. These acts provided sufficient manifestation of Olsen's intent by which the district court could properly conclude that the lease was forfeited, and thereby terminated—in which the lessees acquiesced in exiting the premises forthwith. We are inexorably brought to the conclusion that the surrender occurred on May 19.

The district court was influenced by Olsen's statement that he might afford the defendants the opportunity to re-establish themselves as lessees if they paid the overdue rent by August 29, 1981. That is irreconcilable, however, with the following: First, as of May 19, 1981 the defendants were no longer in the position of lessees. Olsen did not state that he was entering the leased premises as the lessees' agent, or that in such a capacity he purportedly would usurp the operation of defendants' business. Nor did he claim any right to do so. At best, the lessees were out on May 19, and, although given the opportunity, they were not obliged to come back in and revive tenancy. Nor was there an unequivocal statement on Olsen's part that he would be obligated to reinstate the lease.

Second, an August 29, 1981 surrender date does not square with Olsen's May 19 request that the defendants "surrender" possession of the property. The defendants did so; we see nothing evidencing a surrender as of August 29, 1981, which date was merely an arbitrary selection of Olsen as to the final date beyond which he would not consider a reinstatement of the lease. Accordingly, we hold that the district court erred, and as a matter of law the surrender of the lease took place on the 19th of May, 1981.

## IV.

A third issue is whether the district court properly reduced damages owing to Olsen by various amounts either received by Olsen from operation of the property or contributed by the defendants in the building of the ice skating facility. On this issue we affirm the district court.

The defendants argue that the district court improperly refused to grant them credit for $35,000 in construction materials contributed to the ice skating facility. They also argue that the value ensuing from their maintaining in good condition $100,000 worth of equipment used at the facility should have also been used to offset the damages for which they are responsible. Both these arguments are based upon the doctrine of unjust enrichment.

■ Unjust enrichment is an equitable remedy. It is rooted in the theory that where a defendant has received a benefit which would be inequitable to retain, at least without compensating the plaintiff to the extent that retention is unjust, compensation will be ordered. *Hertz v. Fiscus,* 98 Idaho 456, 457, 567 P.2d 1, 2 (1977).

In *Knauss v. Hale,* 64 Idaho 218, 222, 131 P.2d 292, 295–96 (1942), our Supreme Court recognized the common law rule that a lessee, in the absence of an agreement, could not recover from the lessor for improvements made to the leasehold. Since *Knauss,* however, the doctrine of unjust enrichment has been recognized as an equitable exception to the common law rule set forth in *Knauss. See Hertz, supra; Bair v. Barron,* 97 Idaho 26, 539 P.2d 578 (1975); *Nielson v. Davis,* 96 Idaho 314, 528 P.2d 196 (1974); *Haskin v. Glass,* 102 Idaho 785, 640 P.2d 1186 (Ct.App.1982). Accordingly, we turn to defendants' arguments that Olsen has been unjustly enriched by various acts on their part which

should have been offset from the damages sustained by him.

■ 1. The district court, in its memorandum decision, stated that the $35,000 in building materials was part of the consideration in which the parties entered into their agreement. We find this statement supported by substantial and competent evidence in the form of testimony given by Olsen:

Q. By Mr. Anderson: What was your understanding then of this arrangement in the transaction which you were involved as to this $35,000?

A. In the negotiations putting the project together there was four prerequisites and that was one of them, that Country Club Sports would furnish $35,000 worth of building materials, it was my understanding, to be put into the facility and then the amount of the lease that was taken into consideration, they would put that in there. It was also taken into consideration in the amount of the lease, in arriving at the least price—excuse me, the rent figure.

Q. The amount that the rental came out to be considered, that was taken into account as you say I guess is what you are telling me?

A. Yes, taken into the consideration of the amount of the rental payment.

R., Vol. 2, p. 193.

Accordingly, because the $35,000 was part of the bargained-for consideration of the lease, we affirm the district court's refusal to offset that amount from the damages sustained by Olsen; the materials contributed by the defendants to the building of the ice skating facility were not benefits that unjustly enriched Olsen.

■ 2. We likewise find no unjust enrichment in the value received by Olsen resulting from the defendants maintaining in good condition the $100,000 worth of equipment used at the facility. Such a duty was imposed upon the defendants by the terms of the lease. Part IV.B. of the lease required the defendants to provide *and* maintain in good repair $100,000 worth of equipment to be used at the ice skating facility. Thus, defendants' maintenance of the equipment, like the building materials, was simply part of the bargained-for consideration by which the parties entered into the lease. We do not understand that compliance with the terms of a lease or contract, which is thereafter surrendered or cancelled, amounts to an unjust enrichment of the other party to the agreement. Accordingly, as to these two issues, we reject defendants' arguments.

## V.

A fourth issue on appeal is the amount of damages for which the defendants are responsible. The district court's method of computing damages was to list amounts falling due at appropriate dates and compute interest as of the date each debit was incurred. Having changed the date of surrender, we will recompute on the basis of a surrender of May 19, 1981. The district court discerned that the defendants were at the time responsible for $74,747.13 in unpaid rent and other costs, and $4,349.37 in interest for a total of $79,096.50, but deducted $64,101.84 as credit for value of equipment Olsen repossessed and later sold at the UCC sale. Thus, as of May 19, 1981, net damages were $14,994.66. We therefore vacate the district court's June 27, 1984 judgment, and direct it to enter a new judgment as of that date for $14,994.66. We also vacate the district court's prior award of costs and attorney's fees, with directions that upon remand, in light of this opinion, such be reconsidered, with the award and amount thereof, if any, to be determined by the district court.

For the foregoing reasons, we affirm in part, reverse in part, and remand this case to the district court for further proceedings consonant with this decision.

Costs on appeal to appellants, but no attorney's fees included therein.

OLIVER, Acting J., concurs.

BAKES, Acting Chief Judge, concurring in part and dissenting in part:

I concur in the majority's affirming the trial court's finding that a surrender has occurred. However, the trial court's finding that the surrender occurred on August 29, 1981, is not clearly erroneous, I.R.C.P. 52(a), and should be affirmed. Accordingly, I respectfully dissent to Parts II, III and V of the majority opinion.

The majority correctly states the law of surrender of a leasehold, but then proceeds to cloud the principles of surrender by talking in terms of forfeiture and termination of the lease. Therefore, I feel it necessary to restate the principles of law concerning surrender, as distinguished from the principles concerning forfeiture and termination of a lease.

As the majority correctly states, a surrender is the yielding up of a leasehold or tenancy to the lessor by the lessee. Surrender may occur in one of two ways, either by agreement or by "operation of law." In any event, it is a bilateral action requiring the mutual consent of the parties to the lease. *Kennedy v. Nelson*, 76 N.M. 299, 414 P.2d 518 (1966). Termination and forfeiture, on the other hand, is a unilateral act taken by one party to the lease, usually upon default by the other party. Under Idaho law, a surrender is required to be in writing unless it is by operation of law. I.C. § 9–503. Thus, a surrender by agreement must be in writing, whereas surrender by operation of law need not be. Clearly, there is no written agreement in the present case; therefore, any valid surrender must be by "operation of law."

"A surrender by operation of law occurs when the tenant *abandons* the premises and the landlord accepts them back for *his own account.*" Cunningham, Stoebuck & Whitman, *Law of Property*, § 6.80 (1984) (emphasis added). Surrender by operation of law results from acts undertaken by the parties to the lease which imply *mutual consent* to the termination. *Sanden v. Hanson*, 201 N.W.2d 404 (N.D.1972). Consent is inferred from acts which are wholly incompatible with the continued existence of the landlord-tenant relationship. *Hildebrandt v. Newell*, 199 Minn. 319, 272 N.W. 257 (1937); *Riggs v. Murdock*, 10 Ariz.App. 248, 458 P.2d 115 (1969). Such action, initiated by the lessee, usually consists of his abandonment of the premises, *i.e.*, surrender of possession. A lessor undertakes such conduct when he accepts the premises back "for his own account." A lessee who desires to surrender must secure his landlord's consent, and if he alleges surrender he must establish *unequivocal* manifestation of consent on the part of the landlord to termination of the relation of landlord and tenant. *Gordon v. Consolidated Sun Ray, Inc.*, 195 Kan. 341, 404 P.2d 949 (1965).

From the foregoing it is clear that it is the majority's and not the trial court's holding which is clearly erroneous as to the date of surrender. The date of May 19, 1981, cannot possibly be the date of surrender since, as of that date, there was no unequivocal manifestation of consent on the part of the lessor-appellant. As the majority correctly points out, mere relinquishment of the premises by the lessee does not necessarily constitute a tendered surrender. *Krug Park Amusement Co. v. New York Underwriters Ins. Co.*, 129 Neb. 239, 261 N.W. 364 (1935). Likewise, mere re-entry by the lessor does not necessarily constitute acceptance of a surrender. *Ross v. Smigelski*, 42 Wis. 2d 185, 166 N.W.2d 243 (1969) (where landlords gave notice to tenant before they reentered that their objective was to mitigate damages, no acceptance of tenant's surrender of premises has occurred). Neither of these acts are inconsistent with the landlord-tenant relationship. This is particularly true in this instance where the lease agreement expressly provides for the right of re-entry by the lessor in order to mitigate damages upon

breach by the lessee.[1] In order for appellant's actions to be construed as acceptance of a surrender, something more must be shown; it must be shown that his actions went so far as to constitute use of the premises for his own account.

The majority, in effect, makes its own finding of fact that the surrender occurred on May 19, 1981, based upon a letter written by the appellant dated May 19, 1981. That letter is at best equivocal in its expression of intent to accept any surrender *of the lease.* The letter, *ante* at 791–92, 718 P.2d at 1229–30, expressly states that the lessor was requesting relinquishment of possession in order to mitigate damages:

> *"In order to mitigate damages,* we request your clients immediately surrender possession of the Idaho Falls Ice Arena.
>
> . . . .
>
> "... Please *do not infer* the request to surrender possession nor granting of a limited right for your clients to reinstate their position as lessee are *a waiver of any right* by Gary Olsen. He is waiving no right he may have against your clients. *He is only trying to mitigate damages* and grant a new right—the right of reinstatement exercizable prior to August 29, 1981."

Although appellant in that letter speaks of permitting the lessees to "re-establish their position as lessee," when the letter is read as a whole such language can readily and reasonably be interpreted to mean that the lessees may resume their possession of the premises. As aptly stated by the Alaska Supreme Court in *Coffin v. Fowler,* 483 P.2d 693 (Alaska 1971), "Absent evidence of intent of lessors to exclude lessees from *resuming* possession of leased premises following their [relinquishment of possession], lessors' acceptance of keys to premises ... [does] not signify [surrender] of the lease."

Substantial evidence exists which supports the trial court's conclusion that surrender occurred on August 29, 1981. At that time appellant undertook action which arguably was inconsistent with the landlord-tenant relationship. The trial court's finding that, as of that date, the appellant intended to exclude the lessees from resuming possession of the leased premises, and the lessees acquiesced in that action, is not clearly erroneous and should be affirmed. I.R.C.P. 52(a).

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Acting Judge.

The plaintiff, Gary Olsen, in petitioning this Court for a rehearing, has suggested that we substituted our findings for those utilized by the trial court, and also asserts error in our determination that the surrender by operation of law occurred on May 19, 1981.

As to our upholding the trial court's determination that a surrender by operation of law did occur, the plaintiff asserts that both courts "have unfairly seized upon the bare language of 'forfeiture,' 'terminate,' 'surrender,' and 're-establish' found in Olsen's communications to his tenants...." We pause only long

1. The lease provides as follows:

"Default. In the event of default, ... lessor shall have the right to reenter the premises.... If lessee shall abandon or vacate the premises, or if lessor shall take possession because of lessee's default, the rent then due or yet to become due under the terms of this agreement shall be accelerated and become immediately due and payable. All future rent however, shall be discounted to a present value. The discount rate shall be 10%. *After taking possession of the leased premises, lessor may relet the premises for such rent and upon such terms as lessor may see fit. Any rent obtained from the reletting, shall be remitted to lessee until lessee has been paid in full all sums lessee has paid to lessor for rent becoming due after lessor took possession. ...." Cf. Windsor Real Estate & Mortgage Co. v. Ruma,* 674 S.W.2d 252 (Mo.App.1984) (where lease contains a clause granting landlord the right to reenter and release in event of tenant's default, such provision constitutes a consent by tenant to reentry and reletting and prevents the landlord's action from constituting an acceptance of tenant's surrender).

enough to note that the first three of those words are words of art, the meaning of which in the profession is clearly recognized, and the word "re-establish" is a word of common usage and understanding, found in most, if not all, English dictionaries. In the context as used by plaintiff, it obviously conveyed the message that a relationship between the parties *might* by created anew, should the lessees be able to timely comply with the terms and conditions decreed by the plaintiff—some of which included reimbursing him for expenditures which he unilaterally made after retaking possession.

 We have again reviewed the written decision of the trial court and compared it to our September 1985 opinion. Our opinion relies upon the same facts and circumstances delineated by the trial court. Whereas the trial court's written decision states:

> *From the foregoing facts the Court concludes that the effective date of surrender of the premises to the plaintiff was on August 29, 1981.* This conclusion is based primarily on the factual background of the exclusive operation of the premises by the plaintiff and his agents inconsistent thereto with any theory other than his actions were for his own account. Furthermore, prior correspondence from plaintiff's attorney to the defendants had *indicated* that plaintiff would leave the matter open to defendants until that date; hence, based upon that expression of intention and the acts of the plaintiff subsequent thereto this Court concludes that August 29, 1981, was the effective date of the surrender. R., p. 111 (emphasis added),

we reached the conclusion that the effective date of the surrender was on May 19, rather than on August 29. It is axiomatic and unneedful of citation that an appellate court is not bound by a lower court's conclusions, but can and will draw its own conclusions by affixing applicable law to the facts which were resolved by the trial court, or, as here, were undisputed. We are pointed to no error in the conclusion which we earlier drew.

Perceiving that there was a clerical error in the awarding of costs in our September opinion, we strike the award of costs which was made to the plaintiff.

Costs on appeal including proceedings on rehearing, are awarded to the parties who were defendants below and respondents and cross-appellants in this Court.

OLIVER, Acting J., concurs.

BAKES, Acting C.J., adheres to the views expressed in his earlier opinion.