738 P.2d 775

**BUTLER PRODUCTS COMPANY, INC.,**
a corporation, Plaintiff/Appellee,

v.

**Charles D. ROUSH and Carol Roush,**
**husband and wife,**
**Defendants/Appellants.**

**No. 2 CA–CV 5888.**

Court of Appeals of Arizona,
Division 2, Department A.

Feb. 12, 1987.
Reconsideration Denied March 17, 1987.
Review Denied May 27, 1987.

Owens, Rybarsyk & Nussbaum, P.C. by
Paul M. Rybarsyk, Scottsdale, for plain-
tiff/appellee.

Treon, Warnicke & Roush, P.A. by Ar-
thur G. Newman, Jr. and Raymond M. Nor-
ris, Paul G. Ulrich, P.C. by Paul G. Ulrich,
Phoenix, for defendants/appellants.

## OPINION

HOWARD, Presiding Judge.

This is an appeal by guarantors of a
commercial lease who were held liable un-
der their guarantee when the tenant did

not meet the lease obligations. The landlord, Butler Products Company, Inc., (Butler), sued Irv and Joy Molever (Molever) and Charles D. and Carol A. Roush (Roush), guarantors, when the tenant, Aluminum Recycling Company of America, Inc., (Recyco), failed to perform. An order of default was entered against Molever on April 9, 1982, and they are not parties to this appeal.

The case was tried to the court, and judgment in favor of appellee Butler was entered on November 1, 1983, the court finding an abandonment by Recyco. On December 28, 1983, appellant Roush filed a notice of appeal. Butler filed a motion to dismiss the appeal as untimely, which was granted by Division One of this court. The Arizona Supreme Court then granted Roush's petition for review, but on May 21, 1985, vacated the order and denied review. After mandate issued, Roush filed a motion for relief from judgment, pursuant to Rule 60(c), Rules of Civil Procedure, 16 A.R.S. The trial court granted the motion, vacated the November 1, 1983 judgment, and entered a new judgment against Roush on July 16, 1985. This appeal followed. We affirm.

A chronology of events is necessary to understand the facts. A lease dated October 1, 1978, was entered into between Butler and Recyco, with Molever and Roush as guarantors.[1] The lease term was for five years, commencing November 15, 1978. The lease was "triple-net;" in addition to a monthly rent of $2,000 for the first year, with annual Consumer Price Index increases, the tenant was responsible for various expenses cumulatively referred to as "additional rent," including taxes and insurance. The lease included several clauses defining

default, the landlord's notice obligation to the tenant upon default, and the landlord's remedies. These will be discussed in more detail as necessary.

As of March 1981, Recyco was not in default under the lease. At that time, Recyco filed a Chapter 11 reorganization petition, see 11 U.S.C. §§ 1101 et seq.[2] The debtor-in-possession or the bankruptcy trustee continued to make the monthly lease payments to Butler through August 1981. In September 1981, the trustee stopped paying rent and ceased Recyco's business operations on the leased premises. On October 25, 1981, Butler, pursuant to 11 U.S.C. § 365, moved the bankruptcy court to accept or reject the lease. Instead, at a hearing on December 4, the bankruptcy judge, on motion by the trustee, abandoned Recyco's interest in the lease from the estate, rather than accepting or rejecting it.

Butler apparently retook possession of the premises upon the trustee's abandonment, changed the locks[3] and began to clean up the property preparatory to an effort to relet. When the locks were changed, Recyco's equipment and other property were still on the premises. It appears, however, that ownership of all of Recyco's equipment and property had been turned over to Roush by the trustee, even though it remained on the leased premises. Roush had paid a First National Bank lien under a guarantee, and became a creditor in the Chapter 11 proceeding. The bankruptcy court then abandoned Recyco's equipment and property to Roush.

On December 10, 1981, Butler entered into a "Property Management Agreement and Exclusive Listing" with Thomas Manson, a realtor. This agreement, effective

---

1. The guarantee, in its entirety, states: "Each and every term herein binding on the tenant is specifically and without reservation guaranteed by the undersigned."

2. Although the lease expressly states that the adjudication of the tenant as a bankrupt, the taking by the tenant of the benefit of any insolvency act or law, or the appointment of a receiver or trustee in bankruptcy for the tenant's property are each deemed a default, 11 U.S.C. § 365(e)(1) prohibits such clauses from being given effect.

3. There is disagreement as to when the locks were changed. Roush contends that Butler changed the locks "almost immediately" after the December 4 bankruptcy hearing, but in any event, no later than December 10, 1981. However, evidence in the record before us includes two invoices from Phoenix Lock and Key, dated January 20 and February 12, 1982, for changing and re-keying locks on the leased premises.

January 1, 1982, provided in part that Manson act as Butler's agent "with exclusive right to lease, rent, operate, maintain, manage and sell Premises." Manson's testimony indicated that this agreement was really an annual renewal of an existing agreement between the same parties. The agreement authorized Manson to find a tenant for the property at a stated net rent of not less than $3,000 per month.

From December 4, 1981, when the bankruptcy court abandoned the leasehold out of the estate, until May 1983, the property was not relet.

Roush appeals, claiming that the trial court erred (1) in finding an abandonment of the premises by the tenant; (2) in finding that the landlord mitigated its damages; (3) in allowing Butler's former counsel to testify; and (4) in awarding the cost of certain expenses to the landlord.

Before reaching the main issue of abandonment, we note that Butler claims it was entitled to reenter the premises pursuant to the lease default provisions regarding non-payment of rent. We disagree. These default provisions require the landlord to give written notice to the tenant that failure to pay the rent due for ten days constitutes a default, and that after such default, the landlord may elect to terminate the lease by written notice to the tenant "that the Landlord elects to terminate this Lease upon a specified date ... not less than twenty (20) days after the expiration of any notice given under [the non-payment provisions] hereof." The landlord did send a letter to the guarantor demanding full payment of rent arrearages within 10 days, but the notice of election to terminate was never sent. Therefore, reentry by the landlord was not authorized by the non-payment provisions. The landlord's reentry actions can only be justified if there was an abandonment of the premises by the tenant.

## ABANDONMENT

The lease authorizes the landlord to reenter and resume possession of the premises upon abandonment by the tenant. It expressly states that such reentry will not act as an acceptance by the landlord of tenant's surrender, nor does reentry limit the tenant's obligations to pay rent. Upon abandonment, the tenant is also liable for costs incurred to care for the premises while vacant and for repairs necessary in connection with reletting the premises. The issue is whether Recyco, the tenant, abandoned the premises. If Recyco did abandon, Roush as guarantor will be liable for the full amount chargeable to Recyco. This is true even if Recyco has been discharged in bankruptcy. 11 U.S.C. § 524(e). If Recyco did not abandon and is not liable to Butler, then Roush as guarantor is likewise free from liability. *Howard v. Associated Grocers*, 123 Ariz. 593, 601 P.2d 593 (1979).

Abandonment, under state law, occurs when the lessee vacates the premises with the intent to relinquish all its rights. Intent can be shown by words or conduct, and the question of abandonment is a factual one. *Gangadean v. Erickson*, 17 Ariz.App. 131, 495 P.2d 1338 (1972). Determining Recyco's intent is difficult, since it is not a party to this action and there is no direct evidence on this question. The issue is even more confused by the Chapter 11 trustee's abandonment of the leasehold from the bankruptcy estate pursuant to 11 U.S.C. § 554. Abandonment of the leasehold as an asset of the bankrupt's estate is not the same as abandonment of the premises by the tenant. *In re Tyler*, 15 B.R. 258 (Bkrtcy.E.D.Pa.1981). We do not believe that the tenant's intent can be determined from the trustee's actions, i.e., ceasing business operations and non-payment of rent. The trustee's abandonment merely means that the property is burdensome to the estate or is of inconsequential value and benefit to the estate. 11 U.S.C. § 554. Once property has been abandoned by the trustee, it is no longer part of the estate and ordinarily reverts to the debtor. *In re Cruseturner*, 8 B.R. 581 (Bkrtcy. Utah 1981).

The tenant's action or non-action must be reviewed after December 4, 1981, the date the trustee abandoned the lease out of the bankruptcy estate, because prior

to this abandonment Recyco, as the debtor, did not have control over the property. Control vested in the trustee, subject to the jurisdiction of the bankruptcy court. *Stein v. United Artists Corp.*, 691 F.2d 885 (9th Cir.1982). Further, Roush, as guarantor, freely admits liability under the guarantee through December 4, 1981. Therefore, our inquiry as to the tenant's intent is focused on events subsequent to the trustee's abandonment.

After December 4, 1981, Recyco had little contact with Butler. There was testimony that in December 1981, Molever, on behalf of Recyco, tried to negotiate a new lease with Butler's attorney. Molever's proposal, according to Butler's former counsel, was that Butler waive the arrearages, allow Molever six months to operate the business rent-free, and then allow Molever to pay rent of approximately one-half the amount due under the existing lease. Butler's attorney rejected Molever's proposal. Evidence showed that Recyco did not have the funds to continue operations and that the equipment, although on the leased premises, actually belonged to Roush and therefore would be unavailable to Recyco. There was no evidence that Recyco intended to remain in business on the subject property, or that it was ready, willing or able to cure the defaults and resume its obligations under the lease. In fact, Roush testified that in early 1982, Molevar purchased the Recyco name from the trustee, formed a new corporation, and opened a new business at another of Recyco's former locations. We cannot say that there is no evidence to support a finding of abandonment by the tenant.

Appellant claims that the trustee abandoned the leasehold interest to the landlord, and that this operates as a merger of the landlord's reversion and the tenant's leasehold, thus extinguishing the tenant's obligation to pay further rents. Section 554 of the Bankruptcy Code does not dictate to whom property must be abandoned, although generally property is abandoned to the debtor. The order of abandonment, dated June 2, 1982, does not direct abandonment of the leasehold interest to a specific party. However, we need not decide whether the leasehold was abandoned to Recyco or Butler because Roush, in his reply brief, states "guarantors are perfectly willing to agree that 'abandonment' was to the debtor (lessee)."

## MITIGATION

■ Appellant claims that even if it is assumed that Recyco abandoned the premises, the landlord violated its duty to mitigate damages and therefore is not entitled to recover subsequent rents. In Arizona, "in a commercial lease transaction, if the tenant abandons the premises, the landlord is under a duty to make reasonable efforts to rent it at a fair rental." *Dushoff v. Phoenix Company*, 22 Ariz.App. 445, 449, 528 P.2d 637, 641 (1974), reaff'd, 23 Ariz. App. 238, 532 P.2d 180 (1975).

Butler's attempts to relet the premises were delayed by the massive clean-up required after Recyco abandoned. The property was in no condition to be offered until the clean-up was near completion. Manson, Butler's broker and agent, advertised the property in Phoenix newspapers and placed as large a sign as allowed by the sign code on the property. Manson also personally contacted several brokers, trying to generate interest in the property. The record supports a finding that Butler used reasonable efforts to relet, even if those efforts were not immediately successful.

The agreement between Butler and Manson set a net monthly rental of $3,000. Recyco was paying $2,771.78, and we cannot say that a difference of $228.22 requires a finding, as Roush claims, that Butler was acting on its own behalf rather than trying to mitigate Recyco's and Roush's damages. Appellant points to the deposition of George W. Butler, president of Butler Products Company, where Butler stated that he insisted that any new tenant be a national company with a triple A rating and have a guarantor. In the same deposition, however, Butler stated that he was satisfied with Manson's efforts to relet. Neither Manson's deposition nor his trial testimony indicates that he thought he

was instructed to secure a national tenant with a triple A rating and a guarantor. In fact, at trial Manson testified that Butler had never told him that only a national tenant with a triple A rating would be acceptable. We agree that Butler's attempts to mitigate the tenant's and guarantor's damages were reasonable.

## TESTIMONY OF BUTLER'S FORMER COUNSEL

C.D. Owens was formerly counsel to Butler and as such was knowledgeable about the lease and other matters in this litigation. While Owens was Butler's attorney, his deposition was taken. Owens later withdrew as Butler's attorney and was called as a witness at trial by Butler's new counsel. Roush challenges the trial court's decision to allow Owens to testify over his objection, claiming that Owens is precluded from testifying as a witness because he was not listed by Butler prior to trial, as required by Rule 26(e), Rules of Civil Procedure, 16 A.R.S. However, Roush did not object when Owens was listed as a witness for Butler in the Joint Pre-Trial Statement. Further, as the trial judge observed, Owens' relationship to Butler was well known to all parties. His testimony, even if improperly admitted, did not prejudice Roush's position.

## EXPENSES INCURRED

Roush argues that he should not be liable for certain expenses incurred by Butler, because no notice was given to either the tenant or the guarantors. Roush's argument fails for two reasons. First, paragraph 24 of the lease allows the landlord to recover certain expenses upon abandonment of the leased premises without notice. These expenses include reasonable attorney fees incurred to recover possession, costs and charges for care of the premises while vacant, and all expenses incurred in connection with reletting the premises, including the cost of repairing the property. Second, the record clearly shows, both in exhibits and by Roush's own testimony, that Roush not only had notice that the expenses would be incurred but also that he agreed to the work performed.

Affirmed.

HATHAWAY, C.J., and FERNANDEZ, J., concur.