**Mervin R. REID and Ethna R. Reid, Plaintiffs and Appellees,**

v.

**MUTUAL OF OMAHA INSURANCE COMPANY and United Benefit Life Insurance Company, Defendants and Appellants.**

No. 19678.

Supreme Court of Utah.

June 12, 1989.

Rehearing Denied July 11, 1989.

---

Jack L. Schoenhals, Salt Lake City, for defendants and appellants.

Reid Tateoka, Salt Lake City, for plaintiffs and appellees.

ZIMMERMAN, Justice:

Mutual of Omaha ("Mutual") appeals from a judgment in a nonjury trial finding it liable to Mervin and Ethna Reid ("the Reids") for breach of a lease for office space. Mutual contends that the trial court erred in rejecting its claim that the Reids had constructively evicted Mutual and that it also erred in calculating the damages due the Reids. We affirm the judgment of liability for breach of the lease but reverse in part on the determination of damages.

In September of 1980, Mutual, as tenant, and the Reids, as landlord, entered a five-year lease agreement for office space at a monthly rate of $1,100. The lease term was to end in October of 1985. Mutual took possession of the premises, which it used to conduct an insurance sales business. Soon afterward, another tenant moved into adjoining space in the building. The other tenant, Intermountain Marketing ("Intermountain"), operated a door-to-door cookware sales business and used its office space to train its large sales force. Mutual made numerous complaints to the Reids that Intermountain's personnel were excessively noisy, occupied all of Mutual's parking spaces, and otherwise interfered with Mutual's business. Mutual felt that the Reids did not respond adequately to the frequent complaints and, in February of 1982, gave notice and vacated the premises. In April of 1982, the Reids filed suit, claiming that Mutual had breached the lease and was liable for the monthly rental for the three and a half years remaining on the five-year term. Mutual counterclaimed, contending that it had been constructively evicted by the Reids' failure to control the activities of Intermountain. While the litigation was proceeding, the Reids remodeled the premises at issue and leased them to Intermountain for the remainder of the five-year term at a rate comparable to what Mutual had been paying. However, in November of 1982, Intermountain vacated and declared bankruptcy; from that point through the date of trial, the premises were left vacant.

A bench trial was held in July of 1983. After hearing extensive evidence, the court found against Mutual on its counterclaim for constructive eviction, concluding that the noisy conditions were not sufficiently disruptive to amount to a constructive eviction. The court found that Mutual had breached the lease agreement and awarded the Reids damages under the terms of the agreement. These consisted of the total of

the unpaid rents, including both those that had accrued through the date of trial and those that would accrue from the date of trial through the end of the lease term in 1985, less rents actually received from Intermountain during the time it occupied the Mutual premises, plus the costs of reletting and attorney fees.[1]

Before this Court, Mutual attacks the trial court's failure to find for it on the constructive eviction counterclaim. In the event that challenge fails, Mutual contends that the trial court erred in calculating the damages due from Mutual to the Reids.

Mutual's attack on the trial court's constructive eviction ruling has two prongs. First, it contends that the trial court's findings of fact regarding the disruptiveness of Intermountain's behavior are inadequate to support its legal conclusion because they lack the necessary specificity. Second, Mutual claims that the trial court's findings and its resulting conclusion that a constructive eviction had not occurred lack evidentiary support.

■ We first address the challenge to the specificity of the findings of fact. Rule 52(a) of the Utah Rules of Civil Procedure requires the judge in a bench trial to "find the facts specially and state separately its conclusions of law thereon." Utah R.Civ.P. 52(a). The failure to enter adequate findings of fact on material issues may be reversible error. *See, e.g., Acton v. J.B. Deliran, Corp.,* 737 P.2d 996, 999 (Utah 1987). The findings must be articulated with sufficient detail so that the basis of the ultimate conclusion can be understood. *See, e.g., id.* at 999; *Smith. v. Smith,* 726 P.2d 423, 426 (Utah 1986); *Rucker v. Dalton,* 598 P.2d 1336, 1338–39 (Utah 1979).

■ Here, although the findings of fact entered by the trial court are not a model of clarity, we conclude that they are adequate. The findings satisfactorily express the trial court's determination as to the nature of the activities carried on by Inter-

mountain in the space adjacent to Mutual's and its determination that the noise and other annoyances were not so egregious as to render the premises unsuitable for their intended use, as is required for a claim of constructive eviction. *See, e.g., Brugger v. Fonoti,* 645 P.2d 647, 648 (Utah 1982); *see generally* Backman, *Landlord–Tenant Law: A Perspective on Reform in Utah,* 1981 Utah L.Rev. 727, 740 [hereinafter Backman, 1981 Utah L.Rev.]; 2 R. Powell, *The Law of Real Property, Landlord and Tenant Estates* ¶ 232 (1988). The findings are also sufficiently detailed to reveal the trial court's reasoning processes. Therefore, the findings meet the requirements of rule 52(a).

■ We next address Mutual's claim that the findings and the resulting conclusion that there was no constructive eviction are not adequately supported by the evidence. To mount a successful challenge to the correctness of a trial court's findings of fact, an appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even in viewing it in the light most favorable to the court below. *In re Estate of Bartell,* 776 P.2d 885 (Utah 1989) (mem op.); *State v. Mitchell,* 769 P.2d 817 (Utah 1989); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985). The legal sufficiency of the evidence is determined by the standard set out in civil rule 52(a), which provides: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R.Civ.P. 52(a). This "clearly erroneous" standard applies whether the case is characterized as one in equity or one in law. *See Barker v. Francis,* 741 P.2d 548, 551 (Utah Ct.App.1987); *see also Ashton v. Ashton,* 733 P.2d 147, 150 & n. 1 (Utah 1987). A finding attacked as lacking adequate evidentiary support is deemed "clearly erroneous" only if we conclude that the finding is against the

---

**1.** The judgment also included other minor amounts provided for under specific provisions of the agreement. Those amounts are not in controversy on this appeal, and we do not address them.

clear weight of the evidence. *In re Estate of Bartell,* 776 P.2d at 886; *State v. Mitchell,* 769 P.2d at 818; *see Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.,* 744 P.2d 1376, 1377 (Utah 1987); *State v. Walker,* 743 P.2d 191, 192–93 (Utah 1987).

■ Here, the evidence provides adequate support for the findings. We certainly cannot say that they are against the clear weight of the evidence, especially when we give "due regard" to the trial court's opportunity to assess the credibility of the numerous witnesses called by each party. Because the court's conclusion of law on the constructive eviction issue is fully supported by these findings, Mutual's arguments on this issue are rejected, and we affirm the determination that Mutual breached the lease agreement by vacating the premises and failing to pay rent after February of 1982.

Mutual next argues that even if the trial court properly rejected its constructive eviction claim and found it to have breached the lease, the Reids were entitled only to damages for nonpayment of rents measured by those rents that came due between the date of Mutual's last payment and the date of the reletting to Intermountain. Mutual contends that the trial court erred when it included in the measure of damages the unpaid rents that accrued after this reletting.

■ In support of this argument, Mutual relies upon the common law doctrine of "surrender and acceptance." Under that doctrine, when a tenant surrenders the premises to a landlord before a lease term expires and the landlord accepts that surrender, the tenant is no longer in privity of estate with the landlord and therefore has no obligation to pay any rents accruing after the date of the acceptance. *See, e.g., Frisco Joes, Inc. v. Peay,* 558 P.2d 1327, 1330 (Utah 1977); *Willis v. Kronendonk,* 58 Utah 592, 597–98, 200 P. 1025, 1027–28 (1921). *See generally* Backman, 1981 Utah L.Rev. at 737–39; 49 Am.Jur.2d *Landlord and Tenant* §§ 619–25 (1970); I American Law of Property § 3.99 (Casner 1952); Restatement (Second) of Property § 12.1 (1977). Phrased in contract law parlance, the lease is treated as having been rescinded or terminated by mutual agreement.[2] *See* Humbach, *The Common–Law Conception of Leasing: Mitigation, Habitability, and Dependence of Covenants,* 60 Wash. U.L.Q. 1213, 1237–41 (1983). Mutual contends that this common law doctrine was applicable under the terms of the lease agreement. It then argues that the Reids' actions in remodeling the premises and reletting them to Intermountain amounted to an acceptance of surrender that relieved Mutual of its obligation to pay further rents.

■ At common law, the critical issue in applying the doctrine of surrender and acceptance is determining whether the landlord intended to accept the surrender. This intention may be express or implied. *See Frisco Joes,* 558 P.2d at 1330; *Mariani Air Prods. Co. v. Gill's Tire Mkt.,* 29 Utah 2d 291, 293, 508 P.2d 808, 810 (1973); *Belanger v. Rice,* 2 Utah 2d 250, 272 P.2d 173 (1954); 2 R. Powell, *The Law of Real Property* ¶ 249[1] (1988). The lease agreement between the Reids and Mutual deals specifically with the question of how the functional equivalent of an intent to accept a surrender, denominated an "election by Landlord to terminate this Lease," would

---

**2.** Some courts and commentators have taken the view that because a lease agreement is both a conveyance of land and a contract, the consequences of a surrender and acceptance must be viewed differently from either solely a contract law or a property law perspective. For example, the Colorado Supreme Court recently expressed the view that while an acceptance of surrender does terminate all obligation for future rents as a matter of property law, it leaves intact the contractual obligation to pay such rents. Because the landlord and tenant remain in privity of contract, although not in privity of estate, the landlord accepting a surrender can still "maintain an action for contract damages caused by the tenant's breach of the lease." *Schneiker v. Gordon,* 732 P.2d 603, 608 (Colo. 1987). Although the Colorado court did not expressly so state, we assume it would still allow for a complete termination of the lease relationship by means of a rescission. Our view is that the property and/or contract relationship between the parties can be effectively terminated by words or conduct that sufficiently demonstrates an intent to do so.

be manifested. Paragraph 19 of the lease agreement states in part:

> If Tenant shall make default in the payment of the rent reserved ... or if the leased premises ... shall be abandoned or vacated ... then Landlord, in addition to any other rights or remedies it may have, shall have the immediate right of re-entry.... Landlord may elect to re-enter, as herein provided, or Landlord may take possession pursuant to this Lease and relet said premises.... *No such re-entry or taking possession of the premises by Landlord shall be construed as an election by Landlord to terminate this Lease unless the termination thereof be decreed by a court of competent jurisdiction or stated specifically by the Landlord in writing addressed to Tenant.* Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

(Emphasis added.)

The lease thus provided for two means of proving an election by the landlord to terminate: a written notice from the landlord or a decree by a court. It is undisputed that the Reids did not elect to terminate the lease (or in common law terminology, accept the surrender) by means of a writing addressed to Mutual. But Mutual argues that the language referring to a termination of the lease "decreed by a court" should be read to mean that a termination has occurred if a court, applying the common law rules for determining the landlord's intentions from its actions, concludes that there has been an acceptance of a surrender. Mutual then argues that the trial court erred when it failed to decree that the Reids' conduct constituted an ac-

ceptance of surrender that terminated the lease.

We need not decide whether the language of the lease effectively incorporated the common law surrender and acceptance doctrine, as Mutual argues, nor need we address the extent to which the doctrine should be given continuing vitality in modern landlord-tenant relationships. For even if that doctrine did apply, its requirements are not satisfied here.

 At common law, a tenant raising the affirmative defense of surrender and acceptance has the burden of proving the landlord's intent to accept the surrender. *See Mariani Air Prods. Co.*, 29 Utah 2d at 293, 508 P.2d at 810; *John C. Cutler Ass'n v. DeJay Stores, Inc.*, 3 Utah 2d 107, 110, 279 P.2d 700, 702 (1955). And the determination of the landlord's intention is a question of fact. *See Mariani Air Prods.*, 29 Utah 2d at 293, 508 P.2d at 810. Here, then, when the trial court found that the Reids' actions amounted to a reentry and "reletting without termination," it effectively determined that Mutual had not met its burden of proof on the factual question of intent. Therefore, on appeal Mutual has the burden of marshalling the supporting evidence and then demonstrating that the trial court's finding on this point lacks adequate record support under the "clearly erroneous" standard. *In re Estate of Bartell*, 776 P.2d at 886; *State v. Mitchell*, 769 P.2d at 818; *Scharf*, 700 P.2d at 1070. We conclude that Mutual has not met that burden. Our previous cases have held that conduct such as the Reids'—reentering, remodeling, and reletting the premises—is relevant to, but not conclusive evidence of, an intent to accept the surrendered premises and terminate the lease.[3] *See John C. Cutler Ass'n v.*

---

**3.** As we explain in the latter part of this opinion, lessors in the Reids' position have what effectively amounts to an obligation to mitigate damages by seeking to relet the premises. That duty to mitigate, which reflects general principles of contract law, was not expressly considered in our older cases in which reletting was viewed as relevant, although not conclusive, evidence of the acceptance of surrender. Our ruling today requires a reevaluation of those cases. Because we now hold that there is a duty to relet, it follows that it would be unfair and inappropri-

ate to treat such reletting alone as sufficient evidence to show that the landlord intended to accept a surrender of the premises and free the tenant from all obligation for future rents. *See* Humbach, *The Common-Law Conception of Leasing: Mitigating Habitability, and Dependence of Covenants*, 60 Wash.U.L.Q. 1213, 1240–56 (1983) [hereinafter Humbach, 60 Wash.U.L. Q.].

We also note that the question of how an acceptance of surrender is manifested, as well as the related question of whether mitigation of

*DeJay Stores, Inc.*, 3 Utah 2d at 111–12, 279 P.2d at 702–03. We affirm the trial court's finding that the Reids' conduct was a reletting without termination.

Mutual next contends that even if it was liable for some rents accruing after the premises had been relet, the trial court erred in fixing the amount. This argument has several subparts, each of which attacks different parts of the damage award. To put Mutual's contentions in context, a brief review of the court's damage award is appropriate.

Shortly after Mutual's vacation of the premises, the Reids reached an agreement with Intermountain to take over the vacated space. The premises were remodeled to meet Intermountain's needs, and Intermountain took possession under an agreement to remain in possession through the end of Mutual's full term in October of 1985 at the same $1,100 per month that Mutual had agreed to pay. However, Intermountain paid rent only until November of 1982, when it defaulted and vacated all of its rented space. The trial court held that under the terms of the lease, Mutual was liable for all rents accruing from the date of its breach until the date of trial,[4] less any amounts actually received from Intermountain plus the costs of remodeling to meet Intermountain's specifications, as well as attorney fees and court costs. The trial court also addressed liability for rents accruing after the date of the trial. It awarded the Reids an amount equal to the total of all rents that would have come due under the terms of the lease from the trial date through the end of the original lease term in October of 1985, some twenty-four months later, less any amounts the Reids might realize from future reletting of the premises for any part of the original term.[5]

Mutual first contends that the trial court erred in requiring it to pay the Reids an amount that represents the rents that Intermountain had agreed to pay but did not actually pay for the space vacated by Mutual. Second, Mutual claims that the court erred by including in the damage measure future rents that would accrue from the

damages is required of the landlord, has prompted numerous discussions of the dual doctrinal underpinnings of landlord-tenant law, which stem from ancient property law concepts gradually being modified by principles of contract law. *See, e.g., Lindsey v. Normet*, 405 U.S. 56, 87, 92 S.Ct. 862, 881, 31 L.Ed.2d 36 (1972) (Douglas, J., dissenting in part) (ancient property notions replaced by more realistic predominantly contractual analysis of lease interests); Humbach, 60 Wash.U.L.Q. 1213; Berkman, *Duty of Commercial Landlords to Mitigate: Some Thoughts on Danpar Associates*, 55 Conn. B.J. 339 (1981); Kwall, *Retained Jurisdiction in Damage Actions Based on Anticipatory Breach: A Missing Link in Landlord–Tenant Law*, 37 Case W.Res.L.Rev. 273 (1986). While we are cognizant of the deep doctrinal strains such commentators have noted in the law relating to leaseholds, we find it unnecessary to explore those doctrinal concerns in detail here.

It suffices to say that modern landlord-tenant relationships, while steeped in the tradition of ancient property law, have taken on substantive characteristics so similar to commercial transactions that certain of the legal principles developed in the law of contracts in the context of commercial transactions are now appropriately applied to leases, regardless of whether use is made of labels derived from the law of property conveyance or of contract. Our concern with substance rather than form is reflected in the law we apply in the present case with respect to

the manner in which a lease may be terminated and to the requirement that a nonbreaching party must act reasonably to mitigate damages. Whether these rules are labeled as deriving from property law or contract law is of little concern.

4. The trial court actually referred to the date judgment was entered rather than the date of trial. The rules of law we address here require that damages be determined by reference to the date of trial, so that proof of actual mitigation efforts and successes up to the time of trial can be considered in setting damage awards. Therefore, on remand the trial court should recalculate the damage award by reference to the trial date. The date on which judgment is entered is not relevant under the rules we now apply.

5. The precise language of the award was as follows:

Plaintiffs are awarded judgment against Defendants for the remaining payments due under said lease in the amount of $1,100.00 for each month, due on the first of each month, beginning [with the trial date] and continuing until the expiration of the Lease term on October 31, 1985 minus any amounts, after subtracting the costs and expenses of reletting, Plaintiffs may obtain through reletting the premises.

date of trial through the end of the term without expressly requiring the Reids to mitigate their post-trial damages by taking reasonable steps to find other tenants to occupy the premises for the remainder of the term.

 With respect to Mutual's first claim, it concedes that the trial court properly awarded damages for rents accruing between the time it vacated and the time the premises were relet to Intermountain. However, Mutual argues that after the premises had been relet, paragraph 19 of the lease agreement limited the Reids' damages to the difference between the rent reserved for the months remaining under the Mutual–Reid lease and the rent the new tenant *agreed* to pay, rather than the amount *actually* paid by the new tenant.

This argument is utterly without merit. Paragraph 19 states in part:

Landlord may elect to re-enter as herein provided, or Landlord may take possession pursuant to this Lease and relet said premises or any part thereof for such term or terms ... and at such rental or rentals and upon such other terms and conditions as Landlord in the exercise of Landlord's sole discretion may deem advisable with the right to make alterations and repairs to said premises. Upon each such reletting, Tenant shall be immediately liable for and shall pay to Landlord, in addition to any indebtedness due hereunder, the costs and expenses of such reletting including advertising costs, brokerage fees, any reasonable attorney's

fees incurred and the cost of such alterations and repairs incurred by Landlord, and the amount, if any, by which the rent reserved in this Lease for the period of such reletting (up to but not beyond the term of this Lease) exceeds the amount agreed to be paid as rent for the premises for said period by such reletting. *If Tenant has been credited with any rent to be received by such reletting and such rents shall not be promptly paid to Landlord by the new Tenant, such deficiency shall be* calculated and *paid* monthly *by Tenant.*

(Emphasis added.) The emphasized language clearly provides that Mutual was to be responsible for any amounts not actually paid by the new tenant. In effect, Mutual had agreed to serve as an insurer against the default of the new tenant, and the trial court merely enforced that agreement as written.[6]

Mutual's second challenge relates to that portion of the award dealing with rents that were to accrue between the date of trial and the end of the original lease term. Mutual contends that the judgment entered fails to ensure that the Reids would mitigate their damages by reletting the premises.

We are thus faced with the question of whether Utah law imposes a duty upon landlords to mitigate their damages by reletting premises after a tenant has wrongfully vacated and defaulted on the covenant to pay rent. There is no controlling statute,[7] and our research has revealed no

---

**6.** It should be noted that, absent the language in paragraph 19, the result would likely be the same under the duty to mitigate we recognize today.

**7.** Although the parties to this appeal did not bring it to this Court's attention, there is a section of the Utah Code that provides some legislative guidance as to how the question of a mitigation obligation might be answered in a different setting. Section 78–36–12.6, which is part of the forcible entry and detainer chapter of the Code, provides in relevant part:

(1) In the event of abandonment the owner may retake the premises and attempt to rent them at a fair rental value and the tenant who abandoned the premises shall be liable:

(a) for the entire rent due for the remainder of the term; or

(b) for rent accrued during the period necessary to re-rent the premises at a fair rental value, plus the difference between the fair rental value and the rent agreed to in the prior rental agreement, plus a reasonable commission for the renting of the premises and the costs, if any, necessary to restore the rental unit to its condition when rented by the tenant less normal wear and tear. This subsection applies, if less than Subsection (a) notwithstanding that the owner did not re-rent the premises.

Utah Code Ann. § 78–36–12.6 (1987). *See generally* Backman, *Landlord–Tenant Law—A Perspective on Reform in Utah,* 1981 Utah L.Rev. 727, 738–39.

We have never decided whether this language imposes an affirmative obligation to mitigate by reletting, as might well be argued. Our decision

case in which we have directly addressed the question. *See Survey of Utah Law,* 1965 Utah L.Rev. 770, 771. However, the concept of landlords mitigating their damages by reletting has been mentioned in several cases where the doctrine of surrender and acceptance was at issue.[8] In those cases, the Court spoke favorably of, at a minimum, allowing landlords to mitigate by reletting without the risk that such mitigation efforts would be treated as an acceptance of surrender. *See, e.g., Meyer v. Evans,* 16 Utah 2d 56, 57, 395 P.2d 726, 727 (1964); *John C. Cutler Ass'n,* 3 Utah 2d at 111, 279 P.2d at 702; *Belanger v. Rice,* 2 Utah 2d at 252, 272 P.2d at 174.

In looking to the law of other jurisdictions, we find a split of authority on the question. In states following what has been described as the traditional rule, landlords are not required to mitigate by reletting. *See* Restatement (Second) of Property § 12.1(3) (1977); 49 Am.Jur.2d *Landlord and Tenant* § 621 (1970). A number of states have recently reconsidered the traditional view and, following what has been termed a trend rule, have imposed by statute or judicial decision some obligation to relet. *See, e.g., Schneiker v. Gordon,* 732 P.2d 603 (Colo.1987); *Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977). *See generally* 2 R. Powell, *The Law of Real Property,* ¶ 249[2] (1988); Note, *Illinois Landlords' New Statutory Duty to Mitigate Damages: Ill.Rev.Stat.Ch. 110, § 9–213.1,* 34 DePaul L.Rev. 1033 (1985) [hereinafter *Illinois Landlords' Duty,* 34 DePaul L.Rev.]; I *American Law of Property* § 3.99 (Casner 1952); 52 C.J.S. *Landlord and Tenant* § 498 (1968); Backman, 1981 Utah L.Rev., at 728–34. Annotation, *Landlord's Duty, on Tenant's Failure to Occupy, or Abandonment of Premises, to Mitigate Damages by Accepting or Procuring*

*Another Tenant,* 21 A.L.R.3d 534 (1968) [hereinafter Annotation, 21 A.L.R. 3d]. These two competing rules reflect an evolution in the underlying doctrinal approach that has begun to have an impact on many issues of landlord-tenant law. As commentators have noted, the traditional rule imposing no duty to mitigate has its roots in ancient property law concepts under which leaseholds are considered estates in land. The trend rule reflects the more modern view that leases are essentially commercial transactions, contractual in nature. *See Kwall, Retained Jurisdiction in Damage Actions Based on Anticipatory Breach: A Missing Link in Landlord—Tenant Law,* 37 Case W.Res.L.Rev. 273, 274 (1986) [hereinafter Kwall, 37 Case W.Res.L.Rev.].

A number of justifications have been advanced in support of the traditional rule. One is that forcing a landlord to mitigate is unfair when the conduct constituting mitigation might be viewed as evidence of an acceptance of a surrender, a result not actually in accordance with the landlord's intentions. Another justification is equitable in nature: it is unfair to allow the breaching tenant to force on the innocent landlord an affirmative duty to seek out new tenants and perhaps let the premises to tenants not entirely suitable in the landlord's subjective view. A final ground offered for retaining the traditional rule is simply that it is of long standing and in conformance with underlying property law notions. *See generally* 21 A.L.R.3d at 548–49.

The first of these justifications for the traditional rule can be easily obviated. As already noted, there is no reason to permit mitigating conduct to be used as indicia of an intent to accept a surrender. *See supra* note 3. As for the second, there is some validity to the concern that the breaching

---

in the present case is not controlled by section 78–36–12.6 because we have previously construed it to apply only when the tenant has "abandoned" the premises without giving notice. *See Fashion Place Assocs. v. Glad Rags, Inc.,* 754 P.2d 940, 941 (Utah 1988); Utah Code Ann. §§ 78–36–12.3(3), 78–36–12.6 (1987). Here, Mutual gave notice to the Reids when it vacated and thus did not "abandon" the premises within the meaning of the statute.

**8.** The concept of mitigation of damages is grounded in traditional contract law principles and is also known as the doctrine of "avoidable consequences." Under this doctrine, a party injured by a contract breach may not recover damages that he or she, with reasonable effort, could have avoided. *See Angelos v. First Interstate Bank,* 671 P.2d 772, 777 (Utah 1983); Restatement (Second) of Contract § 350 (1981); 5A Corbin, *Corbin on Contracts* § 1039 (1964).

party should not be able to force its landlord to seek other tenants on pain of losing bargained-for rents. However, we think this point is outweighed by the policy arguments in favor of the modern rule, and we think any unfairness to the landlord can largely be eliminated by careful application of a rule requiring reasonable mitigation efforts only.

As for the final justification offered for the traditional rule, it is true that that rule reflects ancient property law concepts; however, those concepts themselves are no longer consonant with most modern landlord-tenant relationships. First, the ancient law of leaseholds was developed in the context of leases of agricultural land. Those leases generally ran from growing season to growing season. If a tenant vacated after planting time had passed, it was unrealistic to expect the landlord to find a new tenant interested in leasing land that was essentially useless for the remainder of the term. *Cf.* Utah Code Ann. § 78–36–4 (1987) (statute allows agricultural land tenant to hold over for another year when landlord fails to object within 60 days to tenant's remaining in possession following lease term expiration). Therefore, a rule requiring mitigation by reletting would have been highly artificial in the practical context of most landlord-tenant relationships. But today, agricultural leases constitute only a minor part of the modern leasing market. Growing seasons are irrelevant to the leasing of residential premises and commercial buildings. Second, the traditional rule also stems from the ancient concept that a leasehold is a complete conveyance of a real property interest such that the tenant becomes, for a defined term of years, the owner of the property and the landlord simply has no present ownership interest in the property during the lease term. It would be logically inconsistent with this concept of a lease to impose upon the landlord, who has no interest in the property during the lease term, the obligation to relet the property for the remainder of that term. *See Welcome v. Hess*, 90 Cal. 507, 513, 27 P. 369, 371 (1891); *Gruman v. Investors Diversified Servs., Inc.*, 247 Minn. 502, 506–07, 78

N.W.2d 377, 380 (1956). Today, leases are generally viewed as commercial transactions in which the landlord retains the estate but permits its use by another on specified conditions; leases are seldom seen as complete conveyances of the underlying property for a specified term. Our unlawful detainer statutes *sub silentio* recognize this changed view of a landlord's retained interest in the property when they authorize a landlord to evict a breaching tenant and reenter and relet the premises in very short order. *See* Utah Code Ann. §§ 78–36–8.5, 78–36–12, 78–36–12.6 (1987).

In sum, the principal justifications given to support the traditional rule are to a large extent anachronistic. In contrast, we find persuasive the reasons advanced in support of the trend rule requiring the landlord to take steps to mitigate its losses. For example, the economies of both the state and the nation benefit from a rule that encourages the reletting of premises, which returns them to productive use, rather than permitting a landlord to let them sit idle while it seeks rents from the breaching tenant. *See Schneiker v. Gordon*, 732 P.2d at 610; *Illinois Landlords' Duty*, 34 DePaul L.Rev. at 1033, 1040, 1064; and Beckman, *Duty of Commercial Landlords to Mitigate: Some Thoughts on Darpar Associates*, 55 Conn.B.J. 339, 345 (1981).

In addition, the trend rule is more in keeping with the current policy disfavoring contractual penalties. Damages recoverable under a liquidated damages provision in a contract will generally be limited to an amount that represents a reasonable estimation, made at the time the contract was drafted, of what would be necessary to compensate the nonbreaching party for losses caused by the breach. This policy is based on the view that any liquidated damages provision not so limited results in the imposition of a penalty on the breaching party that is not permitted. *See Warner v. Rasmussen*, 704 P.2d 559, 561, 563 (Utah 1985); *Water Implement, Inc. v. Focht*, 107 Wash.2d 553, 558–59, 730 P.2d 1340, 1343–44 (1987). Similarly, allowing a landlord to leave property idle when it could be profitably leased and force an absent ten-

ant to pay rent for that idled property permits the landlord to recover more damages than it may reasonably require to be compensated for the tenant's breach. This is analogous to imposing a disfavored penalty upon the tenant.

Finally, the trend rule is more in line with the policy favoring mitigation that we have adopted in other areas of the law. For example, mitigation is generally required when damages are sought in tort cases, as well as in contract cases. *See, e.g., Angelos v. First Interstate Bank,* 671 P.2d at 777; *Jankele v. Texas Co.,* 88 Utah 325, 332–33, 54 P.2d 425, 428 (1936); *see also* Restatement (Second) of Torts § 918(1) (1979).

■ In light of these considerations, we conclude that a mitigation requirement is generally appropriate in the context of modern landlord-tenant transactions, and we join those courts now following the trend rule described above. We hold that a landlord who seeks to hold a breaching tenant liable for unpaid rents has an obligation to take commercially reasonable steps to mitigate its losses, which ordinarily means that the landlord must seek to relet the premises.

■ Certain aspects of our holding require some elaboration. Because a landlord may occasionally bring an action for unpaid rents and other amounts due before the lease term expires, as happened here, it is appropriate that we spell out how the mitigation obligation is to be handled, both as to past due and future accruing rents. If the trial of the landlord's action occurs after the end of the lease agreement, the landlord then has the burden of proving both the amount of damages and the fact that it took appropriate mitigation efforts. Assuming the landlord carries this burden, a judgment and damage award on the whole cause arising out of the breach can then be rendered. However, if the trial occurs before the end of the lease term, a judgment cannot be entered for rents that have not yet accrued; any damage award must be limited to taking account only of rents that have accrued as of the trial date. To recover for later accruing rents, the landlord must bring a supplemental proceeding or proceedings in which it can prove that additional rents have accrued and that reasonable efforts to mitigate those losses have been taken.

■ Another point warranting clarification is the affirmative nature of the mitigation obligation. Some courts imposing a mitigation requirement do not require landlords to show active efforts to relet; instead, the landlord can carry its proof-of-mitigation burden simply by showing that it was passively receptive to opportunities to relet the premises. *See Reget v. Dempsey–Tegeler & Co.,* 96 Ill.App.2d 278, 281, 238 N.E.2d 418, 419 (1968). We conclude that this minimal showing does not serve the policies that underlie the adoption of a mitigation requirement. We prefer to follow those courts that have required that the landlord take positive steps reasonably calculated to effect a reletting of the premises. *See Butler Products Co. v. Roush,* 153 Ariz. 500, 503, 738 P.2d 775, 778 (Ariz.Ct. App.1987); *Schneiker v. Gordon,* 732 P.2d at 611; *Olsen v. Country Club Sports, Inc.,* 110 Idaho 789, 794–95, 718 P.2d 1227, 1232–33 (Idaho Ct.App.1985); *Wichita Properties v. Lanterman,* 6 Kan.App.2d 656, 657–60, 633 P.2d 1154, 1157–58 (1981); *Jefferson Dev. Co. v. Heritage Cleaners,* 109 Mich.App. 606, 611, 311 N.W.2d 426, 428 (1981); *Isbey v. Crews,* 57 N.C.App. 47, 51, 284 S.E.2d 534, 537 (1981); *United States Nat'l Bank v. Homeland, Inc.,* 291 Or. 374, 378–82, 631 P.2d 761, 763–65 (1981). *Cf. Illinois Landlords' Duty,* 34 DePaul L.Rev. at 1044 n. 77 (listing state statutes imposing mitigation duty on landlords). Only by following such a course can we ensure that serious efforts are made to redeploy the rental property in a productive fashion by those who are best able to accomplish that end and who are also best able to prove that required mitigation efforts have been carried out.

■ A further word about the standard by which a landlord's efforts to mitigate are to be measured: the standard is one of objective commercial reasonableness. *See Olsen v. Country Club Sports, Inc.,* 110 Idaho at 794, 718 P.2d at 1232. A

landlord is obligated to take such steps as would be expected of a reasonable landlord letting out a similar property in the same market conditions. *See Illinois Landlords' Duty*, 34 DePaul L. Rev. at 1046–50. Obviously, the objective commercial reasonableness of mitigation efforts is a fact question that depends heavily on the particularities of the property and the relevant market at the pertinent point in time. *See Jefferson Dev. Co.*, 109 Mich.App. at 611–13, 311 N.W.2d at 428–29; *United States Nat'l Bank*, 291 Or. at 379–84, 631 P.2d at 764–67; *Berkman*, 55 Conn.B.J. at 351–53.

 Since we have imposed on the landlord an affirmative obligation to seek a new tenant, it is appropriate that costs reasonably incurred in readying the property and in reletting or attempting to relet be added to the amount recoverable from the breaching tenant. *See, e.g., Richard v. Broussard*, 495 So.2d 1291, 1293 (La.1986). Such costs may include not only expenses incurred in seeking new tenants, but also costs of repairs or alterations of the premises reasonably necessary to successfully relet them. *See Illinois Landlords' Duty*, 34 DePaul L.Rev. at 1059. As in the present case, it is not uncommon for property, particularly commercial property, to be modified to meet the needs of a new tenant. So long as the expenses incurred in the process of reletting, or attempting to relet the property are commercially reasonable, they should be borne by the breaching tenant. *See Illinois Landlords' Duty*, 34 DePaul L.Rev. at 1058–61.

Finally, our ruling that damage awards must take into account only those rents that have actually accrued as of the time of trial deserves explanation. If the trial is held after the lease term has expired, it is a relatively simple matter to assess the landlord's recoverable losses by taking into account the degree to which the landlord has fulfilled its duty to mitigate. However, when the term has not expired by the time of trial, it is impossible to evaluate the adequacy of the mitigation efforts the landlord will have to make in the future with respect to rents that have not yet come due, and it is equally impossible to determine whether those efforts will be successful in reducing losses from future accruing rents. Some means must be devised to permit recovery of actual losses occasioned by future accruing rents while ensuring that the landlord fulfills its duty to mitigate losses.

Commentators have described three basic approaches to this problem of accounting for rental obligations accruing after the date of trial. They are the multiple-cause-of-action rule, the anticipatory-breach doctrine, and the retained-jurisdiction concept. We conclude that only one of these approaches, that of retained jurisdiction, adequately accommodates the values we judge to be important in fashioning a remedy.

The first of these approaches to the problem is labeled the multiple-cause-of-action approach. Under it, the landlord can recover only those rents that have accrued through the time of trial. Once a judgment is entered, the case is closed and the court's jurisdiction over the parties and subject matter ends. To recover additional rents that may accrue after trial, the landlord must initiate a new suit.[9] *See* Kwall, 37 Case W.Res.L.Rev. at 274–75. The justification offered for this approach is that it enables courts to avoid the awarding of uncertain or speculative future damages. *See Frankel v. United States*, 321 F.Supp. 1331, 1340–41 (E.D.Pa.1970), *aff'd sub. nom., Frankel v. Heym*, 466 F.2d 1226 (3d Cir.1972). It also ensures that the landlord's mitigation efforts are all in the past and can be fully evaluated.

---

**9.** The commentators also note a variant of this approach, which may be termed a single-recovery rule, under which the landlord is limited to a single remedy for all obligations under the lease agreement. The landlord must elect between waiting to bring suit after the term has ended or bringing suit earlier and effectively forfeiting later accruing rents. *See* Kwall, *Re-* *tained Jurisdiction in Damage Actions Based on Anticipatory Breach: A Missing Link in Landlord–Tenant Law*, 37 Case W.Res.L.Rev. 273, 330 (1986); *Humbach*, 60 Wash.U.L.Q. at 1251. We reject this variant for much the same reasons we find the multiple-cause-of-action approach to be unsatisfactory.

We find this approach unsatisfactory since it requires a landlord to either forego expected periodic rental payments and bring suit for a lump sum at the end of the lease term or undertake the expenses and difficulties of bringing several separate claims over the length of the term. With either choice, the landlord risks having the tenant leave the court's geographical jurisdiction.

A number of courts have sought to avoid the problems of the multiple-cause-of-action approach by following one of the two other approaches. The first is to apply to leases the contract doctrine of anticipatory breach. *See generally* Restatement (Second) of Contracts §§ 250–57 (1981); A. Corbin, *Corbin on Contracts* § 959 (1964). Under this approach, the landlord can bring suit prior to the expiration of the lease term and obtain a recovery that includes not only already accrued rents, but also an amount that represents the present value of the amount by which the total of the future rents due under the lease exceeds the fair market rental value of the premises over the same period. *See Speedee Mart, Inc. v. Stovall*, 664 S.W.2d 174, 177 (Tex.Ct.App.1983); Kwall, 37 Case W.Res. L.Rev. at 279–91; 2 R. Powell, *The Law of Real Property* ¶ 249[1], at 17–65 (1988). This permits an immediate resolution of the damage issue without placing the landlord at risk of not being able to successfully prosecute further actions against the tenant for the future accruing rents. And it serves the policies of the mitigation rule because, at least in theory, the incentive to mitigate is built into the measure of damages. By limiting the damages to the difference between the rents due and the fair market rental value of the premises, this approach attempts to take into account the amount the landlord will be able to realize by reasonable efforts to relet.

We conclude that the anticipatory-breach approach does not go far enough in avoiding the problem of speculative damages.

It requires a trial court to award what amounts to speculative damages because the damages are to be based on projections as to the future fair market rental value of the premises throughout the term of the lease, which may be for years. Such projections also will inevitably be imperfect in accounting for the landlord's real success at reletting the premises.[10] Thus, this approach sacrifices too much to uncertainty for both the landlord and the tenant in the interest of achieving a quick resolution. We conclude that such a trade-off is unnecessary in light of the availability of a better approach.

The third approach, and the one we adopt, is that of retained jurisdiction. This approach, like the multiple-course-of-action approach, allows the landlord to obtain a judgment soon after the tenant's breach; but rather than requiring the institution of an entirely new suit (or suits) to collect future rents, it permits the court to retain jurisdiction over the parties and the subject matter and enter new damage awards as additional rents accrue. *See* Kwall, 37 Case W.Res.L.Rev. at 328–38. And, unlike the anticipatory-breach approach, this approach does not depend on speculative projections of future events that may lead to under– or overestimation of a landlord's losses. Damage awards will be based on past events only and will take into account the landlord's mitigation efforts. This approach, therefore, should provide an incentive to the landlord to see that its mitigation duty is fulfilled, lest it be denied some of the damages it would otherwise be entitled to.

The retained jurisdiction approach should be implemented as follows: When a landlord's action for breach of a lease is tried before the expiration of the lease term and the finder of fact determines that the tenant has breached the lease, the amount awarded should represent only those rents that have come due as of the

---

10. Some courts following the anticipatory-breach approach have dealt with the concern over awarding speculative damages by arbitrarily limiting the landlord's recovery to rents accruing in a period shorter than the lease term, a period for which damages can be projected with some certainty. *See* Kwall, 37 Case W.Res.L. Rev. at 285–89; 2 Powell, *The Law of Real Property* ¶ 249[1], at 17–65. We find this stunted recovery rule also to be unsatisfactory.

time of trial. This judgment will be immediately enforceable. Rents accruing after the trial, on the other hand, may be recovered through what will amount to rather brief supplemental proceedings. To provide this remedy, the trial court should retain jurisdiction of the underlying action.[11] After additional unpaid rents have accrued, the landlord may return to the court, without the risks and burdens that attend the filing of a new action, for a simple determination of additional losses suffered through the date of the supplemental proceedings and whether the landlord has fulfilled its ongoing duty to mitigate. Under the law-of-the-case doctrine, the initial determination of the tenant's liability would govern in any supplemental proceedings. *See Sittner v. Big Horn Tar Sands & Oil, Inc.*, 692 P.2d 735, 736 (Utah 1984); 46 Am.Jur.2d *Judgments* § 400 (1969).

As Professor Kwall has observed, the concept of retained jurisdiction has been used effectively in other areas of the law where a fair resolution of the matter requires that a mechanism be available for accommodating future developments. Examples include divorce adjudications, probate matters, providing for specific enforcement of certain long-term contracts other than realty leases, and workers' compensation matters. Kwall, 37 Case W.Res. L.Rev. at 291–328. It should be equally effective in the lease context and is well worth the minimal additional burden it may impose on the parties. *See* Kwall, 37 Case W.Res.L.Rev. at 328–38.

Applying the retained-jurisdiction approach to the present case requires a vacation of part of the judgment and a remand for further proceedings. The trial court found that the Reids had mitigated their damages through the time of trial. We have affirmed that finding and therefore affirm the judgment to the extent that it is based on rents that accrued through the date of trial. The second part of the court's order, however, apparently awarded

the Reids damages for rents that accrued after the trial, without imposing on the Reids a continuing affirmative duty to mitigate these subsequently accruing losses. Therefore, that portion of the judgment must be reversed. However, since the trial court continues to have jurisdiction over the case insofar as it relates to rents accruing after trial, the Reids are free to return to the court and reduce to judgment additional damages they may have incurred as a result of rents accruing over the remainder of the now-expired term or additional costs they incurred as a result of their efforts to mitigate. Of course, the Reids must prove at such a proceeding that they have fulfilled their ongoing duty to mitigate.

Finally, the Reids request an award of attorney fees incurred in connection with this appeal. Such an award appears to be within the contemplation of the lease agreement. We therefore remand the matter to the trial court for consideration of an award of such fees and costs. *See Cottonwood Mall Co. v. Sine*, 767 P.2d 499, 503 (Utah 1988).

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice (concurring and dissenting):

I concur in all of the majority opinion except in that part which holds that the trial court's determination that there had not been a constructive eviction of Mutual is supported by the evidence. In my opinion, the uncontroverted evidence of the noise created by Intermountain and its effect on Mutual demonstrate that a constructive eviction did occur. Testimony from both Mutual and Intermountain personnel is in substantial agreement as to the frequency and intensity of the noise. It clearly met the standard for a constructive eviction established by our case law, i.e., that the landlord's actions or failure to act deprives the tenant of the beneficial enjoyment of the demised premises or materially

---

11. Because the entire claim of the landlord against the tenant as it had accrued through the time of trial would be adjudicated in the initial judgment, it would be final for purposes of appeal.

impairs such enjoyment. *Barker v. Utah Oil Refining Co.*, 111 Utah 308, 178 P.2d 386 (1947). The trial court's refusal to so find is "clearly erroneous" even when due deference is given to that court's opportunity to judge the credibility of the witnesses. Utah R.Civ.P. 52(a). The trial court's determination that there was not a constructive eviction is a conclusion of law which is not entitled to any deference by us. *Zions First National Bank v. National American Title Insurance Co.*, 749 P.2d 651 (Utah 1988). The trial court also erred in employing an erroneous standard when it relied on the fact that the noise and other cumulative acts of plaintiffs did not cause any loss of business.

Mutual leased about 60 percent of the main floor of plaintiffs' building. Two weeks later, plaintiffs leased the balance of the space on that floor to Intermountain. Both tenants had to use a common entry and hallway, and employees and clients of Mutual had to pass by the entrance of Intermountain to reach the entrance of Mutual's space. Mutual conducted an insurance business which included rendering service to policyholders and selling insurance to prospective buyers. In contrast, Intermountain used its space mainly to instruct and motivate salespersons and sales trainees to sell housewares door to door. Testimony was adduced from agents and employees of Mutual and from principals and agents of Intermountain that three days each week up to 45 salespersons and trainees were crowded into a room adjoining Mutual's space for training sessions at Intermountain's offices in the building.

During the course of the training sessions, Mutual's beneficial enjoyment of its leased premises was materially impaired by the following acts of Intermountain: Instructors of Intermountain would conduct a motivational exercise known as a "fire-up" drill in which the participants would, in unison, clapping and shouting out loud, count backward from number ten down to one, followed by a shout, "I feel great!" This was followed by loud clapping, cheering, and the stamping of feet. On one occasion, the instructor threw a pie in the face of someone to get the participants' attention and interest. Applause and loud laughter occurred at other times in response to stimuli from the instructor. Loud stereo rock music was played to create an atmosphere compatible with the young trainees. Intermountain freely used the hall leading to Mutual's rented space for the purpose of serving refreshments to participants during break times. Also, registration tables were set up in the hallway, and trainees were permitted to engage in practice sessions with one another in the hall. The large number of participants at times overloaded available restrooms and, on some occasions, used all the paper towels and littered the floor. Intermountain placed in the hall boxes of merchandise which were to be sold or delivered to salespersons or customers. One witness described the hallway as looking like a warehouse. The participants at times filled up the building's parking lot, as well as all available nearby street parking.

All of this conduct by Intermountain was highly disruptive to Mutual and worked to deprive it of the quiet enjoyment of its leased premises to which it was entitled. As employees and clients of Mutual would attempt to make their way through the hall during training sessions, they would on occasion be stopped or directed by Intermountain personnel into the sales and training sessions. When loud noise would emanate from Intermountain's premises, Mutual would have to terminate its activities until the disturbance ceased. Mutual's employees and agents had to either stop or delay their telephone conversations and sales presentations they were making to prospective buyers and apologize for the disruption. Employees and clients of Mutual experienced difficulty in finding parking places when the training sessions were being conducted. The overuse of the restrooms by Intermountain deprived Mutual of a clean and well-supplied facility.

During the sixteen months that Mutual occupied plaintiffs' building, it made numerous complaints to them about Intermountain's conduct. Beginning on June 10, 1981, Mutual sent a series of letters to plaintiffs complaining primarily of the

noise. Other letters were sent on August 5, October 12, November 17, and December 15. In the last letter, Mutual requested that plaintiffs take appropriate action to correct the noise situation immediately and gave notice that should disturbances continue after five days, Mutual would consider the lease to be breached and would vacate the premises. Plaintiffs early on took the position that there was nothing improper about Intermountain's conduct and operation, but they did meet with the principals of Intermountain on several occasions and finally had their attorney write Intermountain, requesting that it cease and desist from further noise. Intermountain temporarily did desist from creating loud noise and agreed that it would not conduct "fire-up" drills with their salespeople before 5:30 p.m., by which time most of Mutual's employees had left the building. However, two principals of Intermountain and two of its salespersons testified that in January 1982, they broke that agreement. One of the principals admitted that he conducted several fire-up drills in January prior to 5:30 p.m. just to "ruffle the feathers" of Mutual's manager. Finally, on February 12, 1982, Mutual paid its rent current and moved from the building, giving notice to plaintiffs that its request as contained in its letter of December 15 had not been met.

The trial court made no findings as to the quantum or frequency of the noise, but concluded simply that "although the court finds the noise made by Intermountain Marketing was distracting to defendants, it was not of sufficient magnitude to warrant abandonment of the leased premises." With that conclusion I cannot agree. It is not clear just how much noise the trial court thought a tenant must tolerate before there is a breach of the covenant of the lease that the tenant may have quiet possession and enjoyment, such as was contained in the lease here. Our case law is clear that constructive eviction occurs when the tenant is deprived of the beneficial enjoyment of the demised premises or his enjoyment is materially impaired. *Barker v. Utah Oil Refining Co.*, 111 Utah at 312, 178 P.2d at 388. One cannot read the record in this case without being impressed that Mutual was long-suffering and endured unnecessary outbursts of noise from its adjoining tenant at least from June 1981 to February 1982. The testimony at trial from six agents and secretaries of Mutual and from four principals and salesmen from Intermountain was that the loud outbursts of noise continued unabated right up to the time Mutual vacated. Mutual took recordings of some of the outbursts of noise and documented them as to dates and times.

One of the plaintiffs, Mrs. Reid, had an office on the second floor above Intermountain and testified that while she could hear the outbursts of noise, the sounds were muffled. This was the entire extent of plaintiffs' rebuttal to Mutual's and Intermountain's testimony respecting the intensity of the noise. Undoubtedly the noise was muffled when it reached Mrs. Reid because there was a solid cement floor separating the second floor from the main floor. While plaintiffs disputed that parking was a problem, they did not contradict the testimony of several Mutual agents that the frequent outbursts of noise were so upsetting that they did not attempt to conduct any sales work on the premises, but were forced to visit prospective buyers in their homes. Mutual's space and Intermountain's space were separated only by a thin portable wall installed over the carpet. One of the principals of Intermountain testified that its business and Mutual's business "clashed." He stated that Mutual was endeavoring to conduct a professional business on a different level from that of Intermountain. Mutual did not make a hasty decision to vacate but exhausted all of its resources and patience to solve the disruption. But despite its pleas and plaintiffs' attempts, the operation of the two side-by-side businesses was simply not compatible. The trial judge erred in requiring Mutual to tolerate and suffer more noise than it had already endured.

The trial court also based its decision in part on the faulty premise that Mutual had not shown that it had lost any business. Our cases do not require that such a showing be made to constitute a constructive

eviction. *Barker v. Utah Oil Refining Co.*, 111 Utah at 312, 178 P.2d at 388, held that there is a constructive eviction when the landlord, without intent to oust the tenant, "does some act which deprives the tenant of the beneficial enjoyment of the demised premises or materially impairs such enjoyment." That is all that is required, and the fact that Mutual did not attempt to prove any loss of business is immaterial.

I would reverse the judgment entered below and remand the case to the trial court with instructions to dismiss plaintiffs' complaint.

STEWART, J., concurs in the concurring and dissenting opinion of HOWE, Associate C.J.